[Civ. No. 12098. First Dist., Div. One. Dec. 2, 1942.]

MARY E. BEMMERLY et al., Respondents, v. COUNTY OF LAKE et al., Appellants.

Burt W. Busch for Appellants.

C. C. McDonald for Respondents.

BRAY, J. pro tem. — Appeal by defendants from judgment enjoining them from widening, deepening or enlarging the arm or slough which constitutes the outlet of the waters of Clear Lake into Cache Creek whereby they pass the land of plaintiffs.

Clear Lake is a navigable body of water in Lake County, about 18 miles long, approximately 7.5 miles in maximum width, and having an area of 64 square miles. Its drainage area is approximately 400 square miles. The level of the lake is variable, being controlled by rainfall, evaporation and discharge through the hereinafter described outlet. This outlet is a narrow channel approximately five miles in length, at the southerly end of which a dam is situated. This dam was constructed in 1915 by the Yolo Water & Power Company and is designated as Cache Creek Dam. Waters draining from Clear Lake pass through said channel and are discharged through said dam into a stream known as the south fork of Cache Creek. Approximately five miles below the dam, the south fork of Cache Creek joins with a stream known as the north fork of Cache Creek, and from that junction easterly to the Yolo By-Pass the stream is called Cache Creek. The plaintiffs own 1,300 acres of land in the Sacramento Valley which are located on Cache Creek several miles easterly from the junction of its two forks. Waters discharged from Clear Lake flow through the outlet channel and dam into the south fork of Cache Creek, thence into Cache Creek itself, mingling with other waters drained from the forks of Cache Creek and Cache Creek itself, and thence past the plaintiffs' property.

The outlet of Clear Lake commences with a slough or arm of the lake which extends for a distance of about two miles from the main body of the lake. At the southeasterly extremity of this arm there is a natural ridge or barrier known locally as "Grigsby Riffle," over which the waters of the lake empty into the outlet channel above described. This riffle, because of its formation, prevents the waters of the lake from emptying into the outlet channel except in restricted quantities.

A gauge for determining the level of the lake is located at Lakeport and is referred to as the Rumsey Gauge. At the present time the capacity of the Clear Lake outlet channel

is regulated entirely by the level of the water in the lake. When the water stands in the lake at the level of four feet on the Rumsey Gauge the outlet capacity is 840 second-feet of water; when the elevation of the lake is 7.56 feet on the gauge the discharge capacity is approximately 2500 second-feet. The Clear Lake Water Company is engaged in the business of irrigating and supplying waters to farmers for irrigation purposes. Its source of supply is Clear Lake and it is the successor to the Yolo Water & Power Company in the ownership of the dam above mentioned. This dam controls the lake levels under certain lake conditions. However, the action of the dam does not particularly affect the questions here involved, for the reason that the water which reaches the dam is controlled by the level of the water in the lake and the amount of water going over the Grigsby Riffle.

In 1919 litigation was commenced against the Yolo Water & Power Company, the predecessor in interest of the defendant Clear Lake Water Company, to determine the rights of said company in using the waters of Clear Lake. As a result, a decree was entered in the Superior Court of the State of California in and for the County of Mendocino in that certain action entitled M. M. Gopcevic, et al., v. Yolo Water & Power Co., et al. This decree, which will be referred to herein as the "Gopcevic Decree," fixed zero on said Rumsey Gauge as the minimum elevation of Clear Lake and 7.56 feet above zero thereon as the normal maximum level except during storms and floods, but in no event above nine feet, for a period of not to exceed 10 days. These elevations were intended to approximate the normal elevations of Clear Lake. The decree prohibited the defendants in that action from permitting the level of Clear Lake to exceed the limits placed by the decree.

Since the Gopcevic decree, homes, buildings and improvements running into thousands of dollars in cost have been constructed along Clear Lake on the assumption that the level of Clear Lake would always be kept within the limits set forth in the decree. Should the elevation of the lake be permitted to go above those limits large areas of improved property would be consequently flooded and damaged.

This very situation occurred during the storms of 1938. On February 15th, the level of Clear Lake rose to 10.25 feet above zero on the Rumsey Gauge. Much damage was caused. Main Street, the principal street of Lakeport, and practically all the roads and highways, including state highways,

along the lake were closed by reason of the flood. Homes were marooned and flooded. Unquestionably several hundred thousand dollars worth of damage was caused.

Due to this situation, the Lake County Board of Supervisors applied to the Department of Public Works and the Legislature for aid, the Clear Lake Water Company agreeing to cooperate in such plan as the state might approve. It was decided that if relief were to be afforded to the property owners around Clear Lake, it would be necessary to increase the capacity of the outlet channel in order to more rapidly lower the elevation of the lake. Moreover, it was necessary to increase the outlet so that in flood time, the rising waters of the lake can be hurried down the Cache Creek outlet so as to prevent the level of the lake exceeding the height permitted by the Gopcevic decree, and thereby violating the provisions of that decree. Plans to that end were drafted by the Department of Public Works. The Legislature appropriated $25,000 and the Clear Lake Water Company agreed to contribute a like sum, to carry out the work. The excavation and dredging work started and had been in progress approximately two months, when a temporary restraining order and injunction was issued in this case, stopping the work. After a trial, this order and injunction was made permanent by the judgment appealed from.

In December, 1937, and in February, 1938, the waters coming into Cache Creek from all sources, including Clear Lake, were so great as to be beyond the capacity of the creek to carry, and the premises of plaintiffs were flooded. On plaintiffs' property are located a two-story dwelling house, barns, garage and outbuildings. The land is used for farming and the raising and feeding of cattle. In the floods of the winter of 1937-38 the water came within 25 feet of the harvester shed, 70 feet of the shop and 75 yards of the house on plaintiffs' property. Feed was spoiled, crops ruined, fences washed out, gullies cut in the land, drift washed on the land and top soil washed away. It was fear of such condition occurring again, particularly if the outlet channel from Clear Lake was enlarged, thereby enabling more water than ever to be discharged from the lake, that caused plaintiffs to seek the injunction in this case. The court found that such fear was justified and that such a result would occur if the defendants were permitted to carry out their plan of increasing, in times of flood, the flow of water out of Clear Lake.

 Appellants in their briefs make some reference to a claim of abuse in discretion by the lower court in granting the judgment by comparing the relative conveniences of the parties involved, and claiming that the property owners along Clear Lake will be more greatly injured by the stopping of the proposed improvement than any possible injury to plaintiffs by reason of its construction. However, this state has at all times refused to follow the doctrine of "balance of conveniences" which is the rule in some jurisdictions, and which actually amounts to a right of private eminent domain which our courts have frowned upon. (*Hulbert* v. *California Portland Cement Co.*, 161 Cal. 239 [118 P. 928, 38 L.R.A. N.S. 436]; *Conaway* v. *Yolo Water & Power Co.*, 204 Cal. 125 [266 P. 944, 58 A.L.R. 674]; *City of Los Angeles* v. *Aitken*, 10 Cal.App.2d 460 [52 P.2d 585].) Moreover, there is involved more than just the question of comparison of the damage to plaintiffs as against the damage to the property around Clear Lake. The report of the Division of Water Resources of the State of California shows that in the 1937-1938 floods the damage to the developments around Clear Lake was estimated at $700,000, while the damage to the lands and developments in the area around plaintiffs' property was $200,000. Appellant at the oral argument of this appeal practically abandoned this point.

The real issue on the appeal then is whether there is a reasonable probability that the increase in the capacity of the outlet channel and thereby in the flow of Cache Creek, which would result from the work proposed to be done by the defendants, will result in substantial damage to the property of plaintiffs. As the lower court has a wide discretion in the granting or refusing an injunction (32 C.J. 29), and as this court is bound by the finding of the trial court on disputed questions of fact, the question here really resolves itself into whether or not there is evidence in the record which supports the court's finding.

 There was introduced in evidence the report of the Division of Water Resources. According to this report the large percentage of the flow of Cache Creek during flood periods originates in the portion of the basin not tributary to Clear Lake due to the present limited capacity of the Clear Lake outlet channel. Cache Creek drains an area of 600 square miles below Clear Lake and not tributary to it. According to the report, the safe channel capacity of Cache Creek as

it flows through the Sacramento Valley and by the plaintiffs' land is 12,000 second-feet. Frank Stephens, field manager of the defendant Clear Lake Water Company, testified that the tributaries of Cache Creek in extreme rainfall were sufficient to fill Cache Creek bank full and that Cache Creek had all it could do to take care of the drainage area it served now without any increase in the flow out of the lake, and that it was not uncommon for the creek to run bank full without water coming out of the lake. Moreover, he testified directly in answer to a question as to what would happen to the property owners along Cache Creek if the creek was running comfortably full and the outflow of the lake was increased, as proposed, to 8,500 cubic feet of water per second-foot, that there was no question but that it would flood the plaintiffs' property, and other property on the lower end of Cache Creek.

The Division of Water Resources report exhaustively studies the amount of rainfall in the area involved from 1873 to 1938 and the proposed plan of flood control of which the enlarging of the outlet from Clear Lake is but a part, and concludes, ''Records indicate that in both the Clear Lake area and lower Cache Creek'' (the area of plaintiffs' property), ''floods of greater magnitude than those of the season 1937-38 have occurred in the past and may be expected to occur again in the future.'' (P. 75.) ''Contributions to the peak flood flows which have occurred in Cache Creek at Yolo'' (where a record was kept, and where, according to the testimony, there was very little difference between the flood conditions and water level in Cache Creek and at plaintiffs' property) ''have originated in most part in the drainage area not tributary to Clear Lake, since this lake, under present and natural conditions, has served as a retarding reservoir to reduce peak flood flows from the basin tributary to it to relatively small amounts compared to the peak flows at Yolo.'' (P. 77.) ''Lands along lower Cache Creek below a point 1.5 miles above Yolo can be protected by means of levees constructed along Cache Creek, without reduction of flood flows, or by a leveed channel combined with control of flows by reservoirs. Lands upstream from the point 1.5 miles above Yolo'' (the area in which plaintiffs' property is located), ''can be most effectively protected by reducing flood flows by upstream reservoir storage.'' (P. 78.) In this report is set forth the plan of reservoir storage necessary to give this protection. This work, while planned as a part

of the whole project, of which the enlarging of the Clear Lake outlet is a part, has not been done. "It is definitely shown by the analyses made that storage for flood control in that part of the Clear Lake-Cache Creek drainage basin not tributary to Clear Lake is essential to the maintenance of safe flows in lower Cache Creek. Also, control of the flows in this portion of the basin would permit the discharge of more water from Clear Lake than is discharged under present conditions, with resulting reduction in high water levels in the lake." (P. 71.)

The report states that the immediate plan proposed for the control of floods at Clear Lake and in lower Cache Creek comprises: (a) The enlargement of the Clear Lake outlet channel to a capacity of 8,500 second-feet. (The work in question here.) (b) Construction of the Indian Valley reservoir on north fork of Cache Creek. (c) Improvement of the lower Cache Creek channel. It is apparent from the report that with the increase in the outlet capacity of Clear Lake, plaintiffs' lands will be flooded in flood times unless the other two parts of the project are completed. ". . . storage for flood control in that part of the Clear Lake-Cache Creek drainage basin not tributary to Clear Lake *is essential* to the maintenance of safe flows in lower Cache Creek." (Report, p. 71.) (Italics added.) The report shows what could be expected to be the situation if the Clear Lake outlet had been completed at the time of the 1937-38 floods and the proposed Indian Valley reservoir not completed, and it has not yet been completed. "It may be noted from the graphs and table that without the use of Indian Valley reservoir the floods analyzed could not have been controlled to 12,000 second-feet" (capacity of Cache Creek at plaintiffs' property). ". . . that during December, 1937, there would have been no reduction in the maximum mean daily flow." (P. 64.)

Again the report states, page 49, "With Clear Lake operated for flood control with an 8,500 second-foot capacity outlet channel, more water would be released from the lake than can be discharged under present conditions. This would result in larger flows at Yolo" (and hence at plaintiffs' property) "unless some of the flood water is stored in reservoirs in the basin." (P. 49.) These reservoirs, though contemplated, have not been built.

There is ample evidence to support the court's finding that the increase of the Clear Lake outlet as proposed will

constitute a danger to plaintiffs' property, because of the reasonable probability of its being flooded in times of flood conditions in the area draining into Cache Creek. The testimony of the field manager of the defendant Clear Lake Water Company, hereinbefore mentioned, the reports of the Division of Water Resources, some extracts from which have been herein set forth, the actual happenings in the 1937-1938 season, when only a small part of the water now proposed to be discharged from Clear Lake was discharged, (and it is probable that worse flood conditions than existed that year can be expected—— "It is apparent, therefore, that the flood runoff into Clear Lake might well be considerably greater than that which occurred in 1937-38." Report, p. 34), all these support the findings of the court.

In the report of the Division of Water Resources, it appears that on a number of occasions, Cache Creek contained water far exceeding its capacity, thereby flooding the adjoining lands. It is obvious, that if the outlet is constructed as proposed, providing an increase of outflow of water from Clear Lake from its present capacity of 220 second-feet to 8,500 second-feet, which the proposed improvement contemplates, such additional water coming out of the lake under conditions recurring as they have in the past, added to the already overburdened condition of Cache Creek, would ensure not only that plaintiffs' property would be flooded as it was in the past, but would be much more badly flooded, due to the increased volume of water coming out of the lake.

Appellants answer this last point by claiming that if permitted to construct the wider outlet, the defendants would be willing to submit to a decree enjoining them from permitting waters to leave Clear Lake at such times as the waters running in Cache Creek were sufficiently high as to cause danger of flooding plaintiffs' property. On the face of it, this at first blush, looks like a reasonable solution of the problem. But it leaves out of consideration entirely the Gopcevic decree which prohibits the defendants from allowing the lake to get above a certain level. The effect of that decree, were the outlet from the lake larger than at present, would be similar to an automatic valve turning loose into Cache Creek the waters of Clear Lake whenever they rise above the prohibited level. At the present time, if they rise above that level, the defendants cannot turn out any more water than has been the normal outflow over the years, and which

by prescription the defendants have the right to release from the lake, even though thereby plaintiffs' property is damaged. But with an outlet with increased capacity above the normal outflow, and in times of flood and increasing waters in the lake, defendants would be faced with the quandary—by allowing the waters in the lake to rise above the Gopcevic decree level, they would damage many people as well as violate the decree, and by pouring the waters out of the lake by means of the changed outlet, they would only be damaging plaintiffs' property. Is there any question of which of these two steps they would take? Plaintiffs would be the sufferers and the effect would be that the defendants were taking plaintiffs' property for the benefit of others without due process of law. Appellants contend that the case of *San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626 [112 P. 182, 35 L.R.A. N.S. 832], is determinative of this case. It is there held that the upper owner along a stream may construct a dam across the same if the lower owners along such stream will not be injured thereby. There is no question but that is the law. However, to make it appear applicable here, appellants take the position that no matter what amount of water may flow into Clear Lake, the dam will hold it, and keep it from flowing into Cache Creek during periods in which the creek is carrying all the water it can. But, as pointed out before, the minute the level of Clear Lake gets beyond the allowances of the Gopcevic decree, defendants will have to open the dam or suffer the penalties of that decree, as they already have once done for violating it. In fact, the very purpose of the proposed improvement is to let larger quantities of water and at a faster rate out of the lake than now. Keeping the dam closed would keep the level of the lake up and would not permit the use as a safety valve against the Gopcevic decree of the proposed outlet. The court held, and the evidence supports the finding that, regardless of the dam, under all the circumstances, in times of heavy rainfall, such as have existed in the past and may be expected to exist in the future, plaintiffs' lands would be endangered by the proposed improvement.

While not referred to in the briefs of any of the parties, consideration should be given to the case of *Archer* v. *City of Los Angeles*, 19 Cal.2d 19 [119 P.2d 1], which holds in a majority opinion that a lower owner has no right of redress for injury to his land caused by improvements made in a stream for the purpose of draining or protecting the land

above, even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements. The soundness of the majority opinion is challenged by a dissenting opinion, which declares that the majority overlooks a long line of decisions in California culminating in *Le Brun* v. *Richards,* 210 Cal. 308 [291 P. 825, 72 A.L.R. 336], holding that it has always been settled law in this state that a lower riparian owner has a lawful right to complain of others, who, by interfering with natural conditions, cause surface water to be discharged in greater quantity or in a different manner upon his land than would occur under natural conditions. In any event, the rule declared in the Archer case could not apply to the facts of this case for the reason that here the cause of the damage when it occurs is the impounding in Clear Lake of the waters so that they can be used for irrigation purposes, thereby interfering with the natural overflow which would otherwise lower the lake so that when flood waters come they would not add so materially to the burdens of Cache Creek. In other words, instead of allowing the waters as they fall or drain into Clear Lake to run off as they did in a state of nature, they are impounded, not for the purposes of preventing flood or damage, as in the Archer case, but for sale purposes. Then, in times of flood, because of the artificial level of the lake maintained by defendants, it becomes necessary to release water quickly in abnormal quantities to prevent damage to properties around the lake caused by the addition of flood waters to that artificial level. Were the waters to run out of the lake as they fall during the rainy season and as they did in a state of nature, plaintiffs could not complain if Cache Creek were unable to carry them off.

Appellants make the further contention that in any event, the judgment goes too far, as appellants claim that, by its language, it enjoins the defendants not only from doing any work which would increase the existing flow in the outlet channel, but would also prohibit any work being done to maintain the existing flow therein, such work, for example, as cleaning out the channel in case it should become filled with silt, gravel or debris which might reduce the present flow. An examination of the language of the decree does not justify appellants' construction thereof. The portion of the decree material to this point reads, ". . . they and each and all of them are hereby, forever enjoined and restrained from in any manner widening, deepening or enlarging the arm or slough which constitutes the outlet of

the waters of and from Clear Lake into Cache Creek and from in any manner changing the said outlet so as to increase the flow of waters of and from Clear Lake into Cache Creek.'' It is apparent from that language, that the court in no way intends to restrict the present flow through said outlet, but merely to enjoin the increasing of such outflow. Under the decree, the defendants at all times would have the right to clean out such outlet, or do anything else necessary to continue the present outflow. The decree in nowise attempts to restrict the defendants in their right to have flow down the outlet channel the amount of water which presently has been flowing there, and which is approximately 2,200 second-feet.

Judgment affirmed.

Peters, P. J., and Knight, J., concurred.