[No. A046835. First Dist., Div. Two. Mar. 8, 1991.]

COUNTY OF LAKE, Plaintiff and Respondent;
THE PEOPLE ex rel. STATE LANDS COMMISSION, Plaintiff and Appellant, v.
M. MARONI SMITH, as Trustee, etc., et al., Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, N. Gregory Taylor, Assistant Attorney General, Jan S. Stevens and Michael L. Crow, Deputy Attorneys General, for Plaintiff and Appellant.

Windrem & Brookes, Peter F. Windrem and Thomas E. Anderson for Defendants and Appellants.

Cameron L. Reeves, County Counsel, and Douglas H. Calkins, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**PETERSON, J.**—Prior judicial decisions have dealt with Clear Lake, a natural and navigable lake in Northern California. Its water level is subject to marked, seasonal fluctuations. Those prior decisions have recognized that, under normal conditions, the "minimum elevation" of the water level is approximated at zero elevation on the Rumsey Gauge, a measuring device placed in the lake in 1873 at the City of Lakeport.

This case presents the question of how the low-water mark of Clear Lake should be determined (as provided in Civ. Code, § 830) for purposes of establishing the common boundary line separating privately owned littoral real property from the area of state owned real property in Clear Lake. For the reasons which follow, we will sustain the trial court in holding that the low-water mark of Clear Lake for such purposes is the level of zero, Rumsey Gauge datum as surveyed by the State Lands Commission in 1967.

### I. FACTS AND PROCEDURAL HISTORY

The relevant facts, to which the parties urge application of diverse legal interpretations, are not disputed. The background to this litigation is substantially composed of prior judicial opinions, which have dealt with related legal issues in the factual context of the often shifting shores of Clear Lake.

### A. *Previous Legal Background*

Clear Lake is one of the larger natural lakes in California; and by law (Harb. & Nav. Code, § 101), it is properly classified as navigable, even though it does not appear to have been recently used for substantial commerce by water; the lake is now primarily used for recreation. Littoral real property on Clear Lake has always been a fertile source of litigation, since the level of this relatively shallow lake fluctuates markedly over the course of the seasons—and from year to year—depending upon natural conditions. A means of measuring the lake's depth and fluctuations is provided by the Rumsey Gauge, which measures fluctuations with reference to a zero point which is slightly higher than an elevation of 1,318 feet above sea level. The Rumsey Gauge has established a record of annual and seasonal lake levels from the year 1873. Typical of the fluctuating levels of Clear Lake, it stood at 3.39 feet below the level of zero on the Rumsey Gauge in November of 1977; 4 months later it had risen more than 11 feet, to stand at 8.23 feet above Zero Rumsey. Such large natural fluctuations have contributed to the dispute on where a permanent "low-water mark" should be placed.

To complicate matters further, the lake's fluctuations have not always been entirely natural. A dam on Cache Creek, the outlet of Clear Lake, was

constructed in 1915 by the Yolo Water and Power Company. Lakefront property owners blamed a series of floods during the years 1915-1919 on the operation of the dam; and litigation began which ultimately resulted in a superior court injunction, called the "Gopcevic Decree," governing the dam's future operation as it affected the level of the lake. (Gopcevic v. Yolo Water and Power Company (Super. Ct. Mendocino County, 1920, No. 9118) stipulated decree filed Oct. 7, 1920; cf. Bemmerly v. County of Lake (1942) 55 Cal.App.2d 829, 831 [132 P.2d 249] [recognizing the Gopcevic Decree].)

Under the Gopcevic Decree, the dam operators were "perpetually enjoined and restrained from at any time, or in any way raising the level of said lake in excess of 7.56 feet above zero on said Rumsey Gauge, and from . . . lowering the level of said lake below zero on said Rumsey Gauge, . . ." except for a limited period during floods or other temporary emergencies. The high level of 7.56 and the low level of Zero Rumsey were chosen because they reflected what was believed to be the natural level of the lake. In 1920, subsequent to the Gopcevic Decree, homes and other lakefront improvements were built by property owners relying on the zero and 7.56 levels as reflecting the range of the low and high levels of the lake.

Significantly, the Gopcevic Decree was recorded at 60 Deeds 49 with the Lake County Recorder's Office. By this and other means, property owners could learn of the Gopcevic Decree and use it to determine their littoral rights.

However, the Cache Creek Dam was not the only human attempt to control the level of the lake which has resulted in litigation. The level of the lake is also affected by a rock formation called the Grigsby Riffle, whose impoundment of the waters at the lake outlet on Cache Creek resulted in the initial formation of Clear Lake. Floods during 1937 and 1938 caused respondent County of Lake (hereafter county) to begin excavation and dredging of the Grigsby Riffle so as to allow floodwaters to escape more quickly from the lake, and to avoid exceeding the lake level set by the Gopcevic Decree. Downstream property owners believed this attempted dumping of excess water, in order to benefit properties littoral to Clear Lake, would flood their properties, riparian to Cache Creek; and litigation began again through Bemmerly v. County of Lake, supra, 55 Cal.App.2d 829.

In Bemmerly, Division One of this district (per Justice Bray) affirmed the terms of another injunction which forbade any efforts to enlarge the channel of Cache Creek at the Grigsby Riffle, although efforts to safeguard the existing flow of water were allowed. (55 Cal.App.2d at pp. 838-839.) In so

doing, the *Bemmerly* court, inter alia, adopted the terms of the prior Gop-cevic Decree as approximating the "normal elevations" of the high- and low-water levels of Clear Lake. (P. 831.)

Our Supreme Court then revisited the shores of Clear Lake in *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239], dealing with a property dispute concerning the owner-ship of the extensive Anderson Marsh which lies between the high- and low-water levels of Clear Lake. The Supreme Court held that a private landown-er owned a fee interest in the marsh down to the low-water mark under Civil Code section 830 (and the Supreme Court indicated Zero Rumsey "may represent" the low-water mark; see *id.* at p. 225, fn. 13), but the court subjected this fee interest to a public trust for recreational use. (*Id.* at pp. 226-233.)

Subsequently, Division One of this district again dealt with the Anderson Marsh along the shores of Clear Lake in *Lyon* v. *Western Title Ins. Co.* (1986) 178 Cal.App.3d 1191 [224 Cal.Rptr. 385], an appeal concerning title insurance to the same property upon which the Supreme Court had im-posed a public trust. Division One, per Justice Elkington, criticized the Supreme Court's decision in *State of California* v. *Superior Court (Lyon)*, *supra*, as an unconstitutional taking of private property without just com-pensation, reasoning the Supreme Court had thereby effectively deprived shoreland property owners of the beneficial use of their land, through impo-sition of a new public trust requiring that the property be maintained as wilderness areas open to the public. (*Lyon* v. *Western Title Ins. Co.*, *supra*, 178 Cal.App.3d at p. 1203.) Justice Racanelli, in a concurrence and dissent, did not take issue with the majority's criticisms of the Supreme Court's rule on the merits, but suggested such extensive criticism of the Supreme Court was unseemly. (*Id.* at p. 1205.)

In a series of other cases between private landowners disclosed by our own research, the courts have also dealt with vexing questions concerning boundaries set by the low-water mark of Clear Lake—which the courts appear to have equated with the low level set by the 1920 Gopcevic Decree, although the matter is not specifically addressed. (Cf., e.g., *Maginnis* v. *Hurlbutt* (1920) 49 Cal.App. 460 [193 P. 606]; *Anderson* v. *Trotter* (1931) 213 Cal. 414 [2 P.2d 373]; *Crews* v. *Johnson* (1962) 202 Cal.App.2d 256 [21 Cal.Rptr. 37]; *Woods* v. *Johnson* (1966) 241 Cal.App.2d 278 [50 Cal.Rptr. 515].) At this point, no appellate court has *expressly* decided the methodolo-gy of establishing the low-water mark of Clear Lake for purposes of Civil

Code section 830.[1] The Supreme Court in *State of California* v. *Superior Court (Lyon), supra*, suggested that it "may" be zero on the Rumsey Gauge. (29 Cal.3d at p. 225, fn. 13.)

### B. *Factual Background of This Case*

Appellant trust fund, U.A. Local 38 Convalescent Trust Fund, and its trustee, M. Maroni Smith, (hereafter jointly referred to as appellant) own a large parcel which is littoral to Clear Lake. During the 1960's, appellant improved the parcel which now consists of a substantial resort property, the Konocti Harbor Inn. Significantly, one of the calls in appellant's deed to the property sets its lakeward boundary as "the low water line of Clear Lake *under ordinary conditions* . . . ." (Italics added.)

During the 1960's, appellant through dredging and filling expanded the parcel lakeward, so that the former natural shoreline is no longer extant; there is now an artificial bulge of dry land out over the lake bed owned by the state and county. Although the state warned appellant that a permit would be necessary for any filling below the level of Zero Rumsey, which it claimed as the boundary line of state owned land, appellant obtained no permit and instead simply expanded its property out into the lake below the Zero Rumsey level.

From 1964 through 1974, the state was engaged in attempts to survey the lakeshore along the Zero Rumsey line; the state was also concerned to prevent or abate private encroachments or "purpresture[s]" (see *Woods* v. *Johnson, supra*, 241 Cal.App.2d at pp. 280-281) on the area of state ownership. From 1974 to the present, the county, as trustee for the state under a legislative grant (Stats. 1973, ch. 639, p. 1165), has been engaged in similar attempts. In 1980, the county brought suit against appellant for damages due to appellant's alleged occupation of public property; by subsequent amendments, the state and other parties were joined; and claims for quiet title and declaratory relief were added. The county did not seek any abatement of the purpresture, and instead sought to quiet title and collect rental damages dating from 1979.

In 1987, the county moved for summary judgment. Following extensive proceedings, the trial court granted the motion, entering an order to that effect in 1989. The trial court's pertinent legal conclusion was its finding

---

[1] When a property is adjacent to a navigable lake or stream, California law presumes that "the owner of the upland . . . takes to the edge of the lake or stream, *at low-water mark* . . . ." (Civ. Code, § 830, italics added; accord, Code Civ. Proc., § 2077, subd. Five.) The state, by contrast, owns "all land below the water of a navigable lake or stream . . . ." (Civ. Code, § 670.)

that "The low water line of Clear Lake constituting the boundary between sovereign ownership and upland fee ownership is the elevation of 0.00, Rumsey Gauge datum . . . ."

After further motion proceedings, the parties entered into a stipulation for judgment, agreeing that, if the trial court's legal rulings were correct, the fair rental value of the disputed land over the relevant 10-year period was $82,148.56. The trial court thereafter entered judgment. Appellant timely appealed, and the state filed a timely cross-appeal.

## II. DISCUSSION

■ We affirm the trial court's legal rulings in their entirety. The trial court properly concluded that the boundary between sovereign and private ownership along the shoreline of Clear Lake was the level of Zero Rumsey established in the 1920 Gopcevic Decree, acknowledged (as approximating the normal minimum elevation) by this district in 1942 in *Bemmerly v. County of Lake, supra*, 55 Cal.App.2d 829, and relied upon by private parties, the state, the courts, and the county since that time as the "low-water mark" which constitutes the common boundary between littoral and state ownership under the provisions of Civil Code section 830.

### A. The Nadir of Appellant's Argument

■ Appellant contends the trial court reached an erroneous legal conclusion, and should have set the "low-water mark" boundary under Civil Code section 830 (hereafter section 830) at the lowest lake level recorded during the 1977 drought: specifically, the level of negative 3.39 Rumsey which was reached for one day on November 14, 1977. Carried to its logical extension, appellant's theory would move the line demarcating the boundary between littoral and state ownership lakeward with each successive severe drought. In other words, if during a prolonged drought a navigable lake temporarily dries up entirely, littoral owners would extinguish the sovereign's rights in the entire lake bed through successive purprestures, regardless of whether that lake rises again to its former level. The trial court properly rejected this argument.

Section 830 provides: "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high-water mark; *when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark;* when it borders upon any other water, the owner takes to the middle of the lake or stream." (Italics added.)

Although at first blush this statute would simply appear to create a presumption regarding the interpretation of the calls in deeds as between private parties, our Supreme Court has held that section 830, instead, constitutes a substantive grant to upland property owners of the state's interest in shorezone land, down to the level of the "low-water mark." (*State of California v. Superior Court (Lyon)*, *supra*, 29 Cal.3d at pp. 222-226.) Taking this interpretation of section 830 as a given, we must then examine as a matter of first impression what constitutes the "low-water mark" of Clear Lake for purposes of setting the common boundary between the land of littoral property owners and that owned by the state.

Section 830 in its three rather pithy clauses establishes a trio of related property rules for different shorezone areas: (1) for tidewater, the boundary is "ordinary high-water mark"; (2) for navigable, nontidal waters, the boundary is "low-water mark"; (3) for nontidal, nonnavigable waters, the boundary is the *filium aquae*, "the middle of the lake or stream." Even though this case deals with the second category of navigable nontidal waters, we will consider the rules stated in the adjoining clauses in order to properly interpret the statute. Appellant's argument that "low-water mark" means the lowest level ever reached is inconsistent with section 830, when the statute is properly read as a whole.

This may be best explained by beginning with the obvious. The Legislature in section 830 intentionally divided the waters of California into three parts for purposes of legal analysis, based upon the dichotomies of tidal vs. nontidal, and navigable vs. nonnavigable. A brief excursus into legal history is also necessary to explain the reasons for this tripartite division.

"At common law the term 'navigable river' was confined to rivers or arms of the sea in which the tide ebbed and flowed. The reason for this rule was that the limit of the tide in all the waters of England was the limit of practical navigation and was, as a consequence, made the test for determining navigable capacity of the stream." (6 Thompson on Real Property (perm. ed. 1962 replacement) § 3074, p. 702, fns. containing case citations omitted.)

"By the common law, even such rivers as the Mississippi, the Missouri, the Ohio, the Hudson, and the Connecticut and other great rivers [such as the Sacramento], above the point where the tide ebbs and flows, would not be navigable rivers, though they are navigable in fact; and therefore, where such a river formed the boundary of land the grantee became a riparian owner, and his grant extended to the center of the river." (6 Thompson, *op. cit. supra*, § 3074 at p. 704, fns. omitted.)

"This [English common-law] test is totally inapplicable in the United States. Fresh water is navigable in the American common-law sense, if it is, in fact, in its natural condition, reasonably capable of valuable use as a public way. Consequently, the English common-law rule as regards navigable lakes and rivers has been changed, and in its place the civil-law rule has been adopted, which recognizes as navigable all streams and lakes which are really so, though they are not tidewater rivers. This is the prevailing doctrine in this country." (6 Thompson, *op. cit. supra*, § 3074 at pp. 702-704, fns. omitted.)

The so-called American rule, thus, recognized that in the settlement of the country, and even today in an age of highways and railroads, the inland navigable waters were in fact public highways and places of public resort—which should not be in private ownership and subject to tolls, blockages, or impositions by adjoining landowners. Section 830, enacted by the California Legislature in 1872, recognized the former English common-law rule as to tidal waters in the first clause of the statute, which allows adjoining private landowners to own only to the "ordinary high-water mark"; the statute also recognizes in part a modified version of the American common-law rule regarding navigable, nontidal waters in the second clause, by allowing private landowners to own in fee a greater portion of the shorezone, down to the "low-water mark." Finally, the third clause reaffirms the common law rule that where a body of water is not "navigable" within any of the meanings variously ascribed to that term and, thus, is not subject to a reserved public right to travel or enjoy its waters, there is no reason to create an intermediary area of sovereign ownership between adjoining landowners; they own to "the middle" of the body of water.

Appellant's argument regarding the navigable, nontidal waters in issue here would seek to change the statutory term "low-water mark" to *lowest* water mark, and would improperly shift Clear Lake from the second clause of section 830 to the third, in which adjoining landowners take title to some portion of the bed of a nonnavigable body of water, depending upon their respective littoral holdings. It would also be inconsistent with the terms of Civil Code section 670 (section 670), which was enacted by the same 1872 Legislature and must be read in pari materia with section 830. Section 670 provides: "The State is the owner of all land below tide water, and below ordinary high-water mark, bordering upon tide water within the State; *of all land below the water of a navigable lake or stream* . . . ." (Italics added.)

Since section 670 was enacted by the same 1872 Legislature in order to complete the same statutory scheme—the specification of property rights in shorezone areas according to the tidal and navigable dichotomies stated in section 830, we must obviously read the two statutes together as specifying the boundary between private and public property along navigable inland

waters. The phrase "at low-water mark" from section 830 must, therefore, specify the same public-private boundary as the phrase "land below the water" from section 670: Along navigable inland waters, the state in order to protect public rights owns all the "land below the water," up to the "low-water mark." (We note that the 1872 Legislature also carried the provisions of § 830 over into Code Civ. Proc., § 2077, subd. Five[2] in the form of evidentiary presumptions, thus completing the statutory scheme.)

Appellant did not at any time own the land which was uncovered during the November 1977 drought. Rather, the line specified by the Legislature—a "mark" created during a time of "low-water" which occurs with regularity, so that the land beyond it is "below the water" in normal years—should be set without reference to unusual droughts or floods.

This is the proper construction, for instance, of the term "mark" as used in section 830 to define the boundary along tidal waters, in the phrase immediately preceding the phrase at issue here. As Division Three of this district has observed, "The statutory use of the word 'mark' [in section 830] connotes a physical mark of the water upon the ground . . . . [¶] But the true rule is to the contrary. The 'high water mark' is not 'a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides.' [Citation.]" (*People v. Wm. Kent Estate Co.* (1966) 242 Cal.App.2d 156, 159 [51 Cal.Rptr. 215].) The *Wm. Kent* court, therefore, rejected the theory that seasonal variation in the water line along tidal waters should cause the boundary to shift back and forth, and instead directed the trial court to fix the property line based upon records of the average of all *neap* tides: "We recognize that the 'almost mathematical line bounding Blackacre' (Rest., Torts, § 943, p. 724) cannot be achieved, but somewhat greater certainty should be possible than the constantly moving line contemplated by the present [lower court] decree." (P. 161.)

Our research indicates this requirement, that lines of low water or high water should be set without regard to unusual conditions, is a rule older than sections 670 and 830 themselves and dates back at least to the case of *Rondell v. Fay* (1867) 32 Cal. 354. *Rondell* was an action brought in trespass in order to try the title to more than 148 acres of low ground in the Marina District of San Francisco, which had been granted under a legislative patent in return for a valuable consideration. (Pp. 355, 362.) The patent was attacked on a variety of grounds, among them uncertainty of the patent which described the land in question as state land under tidal water—de-

---

[2] "When tide water is the boundary, the rights of the grantor to ordinary high-water mark are included in the conveyance. When a navigable lake, where there is no tide, is the boundary, the rights of the grantor to low-water mark are included in the conveyance."

pending upon boundary calls to metes and bounds which were established by reference to the "high water mark" and " 'low water' " (italics omitted), yet also referred to the property as a "marsh" that lay above the level of high tide and, therefore, was not state property subject to a legislative patent at all. (*Id.* at pp. 363-364.)

The Supreme Court disposed of the case by interpreting the terms "high water mark" and " 'low water' " as used by the Legislature in the patent as referring to ordinary high- and low-water levels, the very result codified by the Legislature five years later in sections 670 and 830: "It is claimed by the counsel of the plaintiff that this description is applicable . . . only to lands owned by the State by reason of its sovereignty; that is to say, lands below ordinary high water. [Citation.] And such we consider to be the clear result of the description on its face. The point of beginning is at '*high water mark* in the northerly boundary of lands belonging to the association.' High water mark, in the absence of all statements to the contrary, must be intended to mean 'ordinary high water mark[';] the point at which the sovereign ownership of the State begins. The line extends thence to the north—not landward, but seaward—to a point 'where the water is not exceeding six feet deep at *low water*.' From that point the line turns west and runs under the water at the depth of six feet at the lowest stage of the tide . . . ." (32 Cal. at p. 363, italics added to patent description by the *Rondell* court.)

The same considerations of practicality and avoidance of absurdity which impelled the *Rondell* court to interpret the words "high water mark" and " 'low water' " occurring in a legislative patent as referring to regular and ordinary tidal marks—not some extraordinary level reached during a flood or recession of the waters—also require here that the term "low-water mark" when applied to nontidal, navigable waters under section 830 should delineate an ordinary or regularly recurring level, not some aberrational event.

Relevant authority from the United States Supreme Court, dealing with the setting of boundaries along the low-water marks of nontidal waters, also supports this rule. For instance, in *Vermont v. New Hampshire* (1933) 289 U.S. 593 [77 L.Ed. 1392, 53 S.Ct. 708], a case not cited by the parties, the court was required to cut through a Gordian knot left over from the 18th century: where to set the boundary between Vermont and New Hampshire along the Connecticut River. We need not recapitulate the court's learned exegesis of the Order-in-Council of 1764; quotation of the court's legal conclusion will suffice: "We think that the practical construction of the boundary by the acts of the two states and of their inhabitants tends to support our interpretation of the Order-in-Council of 1764, and of the resolutions of Congress and of the Vermont legislature, preceding the ad-

mission of Vermont to the Union. We conclude that the true boundary is at the *low-water mark* on the western side of the Connecticut River, as the Special Master has found. *We adopt his definition of low-water mark, which is not challenged here, as the line drawn at the point to which the river recedes at its lowest stage without reference to extreme droughts.*" (*Id.* at pp. 619-620 [77 L.Ed.2d at p. 1405], italics added.)

It is also significant that this is the position taken by a respected commentary on real property law. " 'Low watermark' usually means ordinary low water, not extraordinary mark in time of drought." (6 Thompson on Real Property, *supra* (1981 supp.) § 3075, p. 74.) We note that our Supreme Court has previously relied upon this particular commentator in ruling on related questions arising from the operation of section 830. (*Bishel* v. *Faria* (1959) 53 Cal.2d 254, 258 [1 Cal.Rptr. 153, 347 P.2d 289].)

The commentator has been able heretofore to cite for his proposition only the case of *State* v. *Cain* (1967) 126 Vt. 463 [236 A.2d 501], which apparently so reasoned only in dicta and was also not cited by any party to this action. The facts in *Cain*, however, bear arresting similarities to the facts here: An upland landowner along the shore of Lake Champlain—a large, natural, navigable, nontidal lake used primarily for recreation—filled a portion of the lowlying area in front of his property, despite the state's claim to the bed of the lake. (Pp. 502, 504, 506.) The *Cain* court remanded the matter for further consideration, while in dicta it rejected the landowner's claim that the relevant low-water mark boundary was "the lowest elevation point to which the lake had receded during the years examined . . . ," and instead endorsed a rule derived from tidal waters in which the low-water mark is determined by averaging the low-water marks over successive years. (Pp. 503-504.)

We have been unable to find a comparable case or authoritative scholarly commentary from California discussing this precise issue, but find these out-of-state authorities persuasive. We further note that a California Attorney General's opinion reached the same result through analogy to out-of-state authority, and by reference to the state interest in safeguarding public access to navigable waters: "For these reasons it is concluded that the term 'low water mark' refers to the elevation of water in a non-tidal navigable lake or stream at its low point during a normal year, not affected by floods, droughts, or other special circumstances." (*Riparian Boundaries*, 43 Ops.Cal.Atty.Gen. 291, 296 (1964).)

Thus, persuasive authority and commonsense support the conclusion that the "low-water mark," which forms the boundary here with sovereign ownership of the "land below the water," is not some extraordinary "lowest"

level reached during a severe drought, but is a regular or ordinary level which property owners could use for practical purposes in setting a realistic boundary.

We must also note certain other fatal flaws in appellant's contrary theory. First, appellant somewhat inconsistently claims only down to the lowest level reached in the 1977 drought, negative 3.39, rather than the lowest level ever recorded, negative 3.50 in 1920. Appellant apparently reasoned (accurately) that the negative 3.50 figure from 1920, never since repeated, is so distant in time as to appear clearly aberrational and almost ridiculous as a proposed boundary for the determination of a property dispute arising in the 1980's. Little difference exists, for appellant's purposes, between the 3.50 and the 3.39 figures; and appellant seemingly concedes the difference of .11 of a foot to state ownership.

However, even though the state has not pointed out this implicit concession by appellant, it in fact gives away appellant's entire case. Appellant does not contend its predecessors in interest acquired the land exposed by drought in 1920 to the level of negative 3.50 on the Rumsey Gauge. On acquiring the littoral property in the 1960's, appellant could not thereafter logically acquire the disputed land on the same rationale; i.e., because the lake would fall to a low level caused by subsequent drought about 15 years after appellant's purchase of the littoral land. Appellant's theory is that a *past* lowest level, not an expectation of a *future* lowest level, determines the boundary. If appellant did not acquire ownership of the land in question at the time of the acquisition of the parcel, appellant did not come to own the land thereafter. By the time of the 1977 drought, the disputed strip had long since been converted by appellant into dry land through filling. This dry land appellant, thus, created with fill was always in state ownership prior to 1977; it did not later pass into private ownership as a result of filling, or because in 1977 the adjoining lake fell to a low level, any more than ownership of any other upland parcel would be so affected by the lake's level. In 1977, the dry land in question was no longer a part of any lake; and falling of the lake's level in that year did not convert the fill, and the state owned land over which it was placed, to private ownership simply because a drought reduced the lake's water level to a point where the state owned lake bed in its prefill condition would have been above water.[3]

Second, as the state does point out, appellant's own deed to the property specifies that appellant takes only to the level of a boundary formed by "the low water line of Clear Lake *under ordinary conditions.*" (Italics added.)

---

[3] Further, appellant's attempt to draw an analogy to cases of natural accretion is beside the point. There was no natural accretion to appellant's property.

The actual result in this case need not wholly turn upon the recital in the deed; the calls of a deed may, of course, be erroneous. However, the deed's recital is completely inconsistent with the claim that appellant in fact owned down to a lower, extraordinary level; and it clearly militates against appellant's position that the equities somehow allow us to redraw the boundary in the guise of legal interpretation, or that the state and county should be somehow estopped to claim the true boundary.

The facts here are that appellant acquired property with a stated boundary in the deed; appellant sought permits to enlarge it beyond the deed's recital of the boundary, at the expense of adjoining public land; appellant failed to obtain any such permission, but proceeded in its expansion plans anyway; and through the delays of the state and county, in fact, appellant secured the use of the disputed property rent-free until 1979.[4]

■ The state and county do not seek abatement of appellant's purpresture, but only seek payment of what the parties agree is a reasonable rent for the occupation since 1979. We agree the sovereign's actions here were not always swift or sure, but those defects do not on these facts allow us to alienate state lands to a private party. No grounds for an argument by appellant based upon estoppel or laches readily appear, and our Supreme Court in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 501 [91 Cal.Rptr. 23, 476 P.2d 423] indicated that estoppel theories should only be applied to affect public rights in shorezone areas if an estoppel was required in order to avoid "great injustice" to adjoining landowners—a standard which does not apply here. Further, even if consideration of the equities were somehow independently relevant, and even if this case did not involve public rights, the equities certainly do not favor appellant's argument for a "lowest level" boundary.

The trial court correctly rejected appellant's claim that the "low-water mark" boundary under section 830 was instead some lowest level reached in a severe and temporary drought.

B. *Return to Zero*

■ Although we have no trouble concluding that the boundary set by the "low-water mark" here is not the lowest level sought by appellant, still

[4] We also reject appellant's claim that the lowest water level should be decreed to be the boundary, so as to insure that littoral owners have access to the lake at all times. First, there is certainly no evidence that sovereign entities ever sought to prevent appellant or any other littoral owners from enjoying access to the water. Second, appellant and other owners are protected from such an attempt to block their access to the water, since they share in the access rights which all citizens enjoy by virtue of the public trust doctrine. (See *State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d at pp. 226-233.)

at first blush, there might be some greater difficulty in determining where the "low-water mark" really lies, as a practical matter, among the various values to which the lake has receded over the years. In this case, the trial court correctly concluded that a level of zero on the Rumsey Gauge was the "low-water mark" on Clear Lake.

A number of alternatives were either suggested by the parties or by the evidence: the "lowest" levels of negative 3.39 or 3.50 Rumsey, which we have already concluded the trial court properly rejected; the level of positive 1.36, which the state urged the trial court to adopt, based upon analogy to the law of prescriptive easements; the level of the average or mean value over the years, which would appear to be positive 1.19; or finally, the trial court's chosen figure of Zero Rumsey. We treat the rejected alternatives in turn.

### 1. Prescription

■ First, the trial court properly rejected the level of 1.36 Rumsey, which was based upon the state's argument by analogy to the law of prescriptive easements. A brief discussion of the case law is necessary in order to explain this theory and show why it is inapplicable.

In a companion case decided on the same day as *State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d 210, which had dealt with the application of the public trust doctrine to Clear Lake, our Supreme Court ruled in *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240, 247-249 [172 Cal.Rptr. 713, 625 P.2d 256] that public rights in the shore-zone of Lake Tahoe (i.e., public ownership of the fee below the level of low water, and public trust rights between the low-water and high-water marks) should be determined based upon the current condition of that lake, not its last natural condition (in 1870) which was significantly lower. If the court had adopted a contrary rule, the area of public rights would apparently have been under water and unusable. The Supreme Court noted that the 1870 dam and the associated significant rise in the level of Lake Tahoe had been a fact of life for adjoining landowners and the public for over 100 years, well beyond the period required for the acquisition of prescriptive rights. (*Id.* at p. 248.) Relying in part on an analogy to out-of-state authority which dealt with the flooding of land by artificial reservoirs, the court concluded that "under all the circumstances," the public rights around the shore of Lake Tahoe should be determined based upon the present, not the past, condition of the lake. (*Id.* at p. 249.) Of course, this conclusion is entirely consistent with our holding that shorezone ownership should be determined by taking into account the realities of the present condition of

the littoral area, and should not be based upon some past low level of a lake which is irrelevant to current conditions.

This was not the end of the Lake Tahoe litigation. Subsequently the Third District, in *Fogerty* v. *State of California* (1986) 187 Cal.App.3d 224, 240 [231 Cal.Rptr. 810] and footnote 10, applied the Supreme Court's principles and determined that the high-water mark of Lake Tahoe—which was the boundary between the area of the public trust and the area of unrestricted private ownership—should be fixed based upon prescriptive principles by a methodology which isolated "the five consecutive years of highest water since 1944" and then fixed the high-water mark at "the lowest of these five [highest] elevations . . . ."

We understand the reasoning of these decisions dealing with the determination of a *high*-water mark where construction of a dam has caused the level of a lake to be significantly and permanently raised above its natural level, but agree with the trial court that these precedents are inapplicable to the determination of the "low-water mark" on a natural lake whose low level was not significantly affected by human activities, and which instead remains subject to cyclical natural variation. Therefore, the trial court properly rejected the state's argument for a "low-water mark" determined under the mirror image of the inapplicable *Fogerty* methodology, based upon the temporary rising of the lake during the five-year period from 1967 through 1971, to a level of at least 1.36 Rumsey.

The *Fogerty* litigation clearly dealt with a situation in which, in the distant past, the level of a lake had been permanently raised by a dam—so that human activities around the lake were required to be governed in succeeding periods by the raised level. Here, we deal by contrast with a situation along the shores of Clear Lake in which prior litigation essentially defeated past attempts to control the natural variation in the level of the lake, and in which the lake continues to rise and fall significantly within its natural range.

The *Fogerty* problems also revolved around the setting of the high-water mark, which forms the boundary between the area of nominal private ownership—a naked fee subject to essentially determinative public trust rights—and the area of unrestricted private ownership subject to development. In our case, we deal instead with a low-water boundary which determines the area of a fee interest allowing the state or county as its trustee to charge rent to encroaching parties. The considerations which motivated the *Fogerty* result in the Supreme Court—the fragility of shorezone areas and their importance for public interests (29 Cal.3d at pp. 245-246)—are essentially absent here, where we need not set a high-water mark at a sufficient

elevation to ensure the maintenance of public control over destructive private exploitation, and instead are simply determining a low-water boundary for the purposes of rent, within the area subject to state control either by fee or by public trust.

Moreover, it is hard to see how a prescriptive theory could apply here at all. As opposed to cases where a landowner's parcel is suddenly flooded out by a reservoir—certainly a hostile and notorious occupation, the only basis for any prescriptive argument here would lie in arbitrarily excising from the cyclical natural variation in the lake level some artificial five-year period in which the water swelled a little higher on upland parcels. There would be nothing necessarily hostile or notorious about such a circumstance; and for all we know, upland landowners welcomed the prospect of a full lake adjoining their parcels. The record fails to disclose that the state in any way relied or depended upon this type of covert invasion for prescriptive purposes; and there is clearly nothing hostile or notorious about the seasonal rising of the waters, reasonably expected to eventually fall back again as they always have.

In this particular case, prescriptive principles seem wholly inapplicable because, inter alia, there was no occupation at all, whether hostile, friendly, or notorious, of the area in question by lake water in 1967-1971. Appellant, by its filling operation in the 1960's, prevented any occupation of its filled land by water. We cannot adopt prescriptive principles on an analysis of what might have happened by way of water incursion if the fill, placed 15 years previously, were absent so as to arguably permit that incursion on the property in its prefill condition, thereby establishing prescriptive rights.

We note, however, that the state and county primarily urge us to affirm the trial court's figure of Zero Rumsey, and only suggest the *Fogerty* methodology as an alternative in the event we do not affirm the trial court. It is an alternative we will not have occasion to accept.

### 2. The Mean Water Level

■ Another alternative suggested by the evidence and the relevant case law would be the mean or average level of low water over the period beginning in 1873, when records were first regularly kept. As we have discussed, California courts have adopted the concept of the mean for the purpose of determining the high-water mark under section 830 along tidewater (cf. *Rondell* v. *Fay, supra,* 32 Cal. at p. 363; *People* v. *Wm. Kent Estate Co., supra,* 242 Cal.App.2d at p. 160); further, certain out-of-state courts have also indicated the same approach should be followed in setting a low-water boundary along inland navigable water. (Cf. *State* v. *Cain, supra,* 236 A.2d at pp. 503-504.) If we were writing on a clean slate, we

could reach the same result here, setting the "low-water mark" at the apparent mean value of 1.19. Fixing the "low-water mark" with reference to the mean or average low-water level comports with the proper interpretation of the word "mark" as signifying a level to which the water tends to return, on average; it also avoids giving undue weight to droughts or floods, which will affect an average of many years only slightly.

In *Fogerty* v. *State of California, supra*, the Third District was also apparently tempted to set the high-water mark of Lake Tahoe at the mean value, but ultimately rejected this figure because it was inconsistent with the prescriptive rights doctrine which should determine the level after construction of a dam has significantly raised the level of a lake, and because there were apparently problems in determining how far back to go in gathering values for the purpose of averaging, given fluctuations caused by the dam. (187 Cal.App.3d at p. 240, fn. 12.) Those problems do not exist here. We have an unbroken series of recorded low values dating back to 1873, when section 830 became effective; the series does not reveal any marked bias in the level of the lake after abortive attempts at human interference in the 1915-1920 or 1938-1940 periods. Further, use of the average might best avoid the possibility of excessive divergence between the fixed value for purposes of a fee, and the actual value in any specific year.

Although of course a mathematical average is in some sense as arbitrary as any other figure, it certainly has a quality of Solomonic rectitude: We can be reasonably certain that as a general rule it might tend to make the parties equally unhappy, and by definition the mean value is not some abnormal or aberrational figure. We can also envision other values in the center of a long series of annual low-water levels which might be appealing (for instance the median value, or even the mode or most frequent value); but in this instance the mean, median, and mode all lie between 1 and 1.5 Rumsey. For present purposes, the difference between them is almost vanishingly small; and clearly the area between 1 and 1.5 Rumsey is where, for practical purposes, one would be tempted to set the boundary between land and water if there were no prior contrary history or judicial consideration.

However, in this case there certainly are countervailing considerations. Since 1920, judicial decisions have equated the low level of Clear Lake with Zero Rumsey—and, more crucially, upland landowners and the state have to a great extent relied upon that figure. No party to this appeal urges us to adopt the mean value; while that fact obviously is not determinative, we are reluctant to impose upon landowners who have relied upon prior contrary decisions a new boundary which no one seems to want. We believe that in this particular case we should not do so, even though in other respects the

mean value is the one which apparently best comports with the principles underlying section 830.

### 3. Agreed Boundary

 The state and county urge us to affirm the trial court's figure of Zero Rumsey, based upon the analogous doctrine of an agreed boundary. The trial court's ruling apparently relied upon both the theory of an agreed boundary, and upon the effect of prior court rulings setting the boundary at Zero Rumsey, which theory we agree is correct (see pt. II, B.4., *post*). We may affirm the trial court if its ruling is right, even if we disagree with one of the precise rationales the trial court selected. (See *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) " 'If right upon any theory of the law applicable to the case, [the ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*Ibid.*, quoting *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) We find the trial court's ruling to be correct, but we do not affirm it based on the theory of an agreed boundary.

 First, as appellant points out, *it* never agreed *to* a boundary of Zero Rumsey. Appellant certainly knew the state claimed up to that level, but appellant never acceded to that claim, and appellant's actions indicate a contrary intent: Appellant arguably sought to acquire what area it could, and never agreed to Zero Rumsey. An agreement on nothing is not the same as an agreement on zero.

We cannot find a principled way to shoehorn these inconvenient facts within the accepted parameters of the doctrine of an agreed boundary. As this court (Division Two), speaking through Presiding Justice Kline, has recently observed, "the critical question is the parties' *intent* to create a [new agreed] boundary to settle their subjective uncertainty as to the true line . . . ." (*Armitage* v. *Decker* (1990) 218 Cal.App.3d 887, 900 [267 Cal.Rptr. 399], italics added.) We can find no sufficient evidence that appellant or its predecessors ever agreed or jointly intended to create such a new boundary on the lakeward edge of its parcel. Appellant would logically have been highly unlikely to have so agreed, since it filled and constructed buildings lakeward of the Zero Rumsey level on what would be state land under the supposed agreement. The facts of this case certainly are not comparable to those in *Muchenberger* v. *City of Santa Monica* (1929) 206 Cal. 635 [275 P. 803], where the evidence showed the parties to a shorezone dispute agreed to conduct a survey and set the boundary in a specific way according to that survey.

Moreover, although we agree some factors supporting the underlying rationale of the agreed boundary doctrine are present here—uncertainty as to the true line, and the policy of the law to respect the legitimate interest of landowners in resolving such uncertainty, we are unwilling to expand the doctrine of agreed boundaries in a shorezone context so as to allow the state or landowners to establish retrospectively some purely fictional new boundary nowhere marked out or made manifest to the parties. Quite aside from the "great injustice" which could thereby result, this would probably defeat the original purpose of the agreed boundary doctrine—the avoidance of litigation. (Cf. *Armitage* v. *Decker, supra,* 218 Cal.App.3d at p. 903.)

### 4. The Effect of Prior Court Rulings

■ However, we may still affirm the trial court's ruling. As we have discussed, since the Mendocino County Superior Court's unappealed Gopcevic Decree in 1920 approximated the low level of Clear Lake under normal conditions at Zero Rumsey, successive courts have either endorsed this figure or simply assumed it was the "low-water mark." More importantly, the landowners around the lake, and the state, have relied upon this figure as setting the boundary under section 830. Further, the Gopcevic Decree was recorded with the county recorder's office and became the boundary for both practical and legal purposes.

As Justice Bray recognized in 1942, "This decree . . . fixed zero on said Rumsey Gauge as the minimum elevation of Clear Lake . . . . [¶] Since the Gopcevic decree, homes, buildings and improvements . . . have been constructed along Clear Lake on the assumption that the level of Clear Lake would always be kept within the limits set forth in the decree." (*Bemmerly* v. *County of Lake, supra,* 55 Cal.App.2d at p. 831.)

As the State Lands Commission recognized in 1967, the Gopcevic Decree "established zero on the Rumsey Gauge" as the low-water level of the lake. "Most of the property owners in the area were parties to that suit, and the decree has been generally followed since then. The State was not a party, but has followed the decree informally in its activities at the lake. To remove uncertainty in boundary lines, it is desirable that the State make a finding as to the accepted boundary." Therefore, the state approved a resolution stating, "The [State Lands] Commission finds that the low water mark and boundary between state and privately owned land at Clear Lake is . . . zero on the Rumsey Gauge . . . ."

As previously noted, if not for the fact that Zero Rumsey has generally been recognized as the boundary, we would choose a higher level, the mean level of 1.19 Rumsey, as the boundary. Upland landowners such as appel-

lant obviously have no interest in seeing the boundary set at this higher figure, which would increase the area of state ownership and increase the rental liability of encroachers. The state through the action of its Lands Commission disclaimed any attempt to set the boundary higher than Zero Rumsey, and the state and county in this appeal urge us to affirm the trial court ruling that the boundary is Zero Rumsey. Given the fact that numerous private landowners have built upon parcels—including those constituting much of the town of Lakeport—down to the level of Zero Rumsey, relying on this level as their boundary, it is clear that a contrary decision would result in "great injustice." (*City of Long Beach* v. *Mansell*, *supra*, 3 Cal.3d at p. 501.)

We emphasize the fact that we deal here with the unique situation of Clear Lake, not some navigable California lake in the abstract. Other lakes might have records of the findings on gauges which are kept by private parties or public entities, for the purposes of water management or simple historical interest. The distinguishing factor here is that in 1920 a superior court, having appropriate jurisdiction to do so, handed down the Gopcevic Decree concerning the water level of Clear Lake. That court found the normal minimum elevation of Clear Lake to approximate zero on the Rumsey Gauge; the decision was not appealed. By the time Justice Bray of this district wrote on the subject in 1942, he was faced with a situation in which extensive reliance on the prior 1920 decree had made this level of zero a matter of largely unquestioned precedent. In the almost 50 years since then, further extensive private reliance on, and general recognition of, the level of zero and its endorsement by the state have only served to strengthen the case for Zero Rumsey, whether viewed under the rubrics of relevant precedent, estoppel, or detrimental reliance.

Even in the uncertain context of California shorezone titles, the settled expectations of the sovereign on the one hand and the respective riparian or littoral landowners on the other are entitled to considerable weight, despite the fact that sovereign public rights (here, the possible sovereign ownership of the land lying between Zero Rumsey and the mean low-water mark) may be affected. (See *Summa Corp.* v. *California* ex rel. *Lands Comm'n* (1984) 466 U.S. 198, 209 [80 L.Ed.2d 237, 245-246, 104 S.Ct. 1751].) The issue in *Summa Corp.* was whether California shorezone land patented to a grantee under an administrative claims procedure established by the Treaty of Guadalupe Hidalgo (hereafter treaty), which patent had been confirmed by the United States District Court on appeal and accepted for decades by sovereign administrative bodies and private landowners, was conclusive in preventing the creation of the public trust rights imposed a century later by our Supreme Court. A unanimous federal Supreme Court held, in such context, that the considerations of prior reliance on the result of the administrative

procedure, the unappealed trial court decree, and administrative acquiescence by sovereigns would prevail: "We hold that California cannot at this late date assert its public trust easement over petitioner's property . . . . The interest claimed by California is one of such substantial magnitude that regardless of the fact that the claim is asserted by the State in its sovereign capacity, this interest . . . must have been presented in the patent proceeding or be barred. Accordingly, the judgment of the Supreme Court of California is reversed . . . ." (*Ibid*. [80 L.Ed.2d at p. 246]; accord *City of Los Angeles* v. *Venice Peninsula Properties* (1988) 205 Cal.App.3d 1522, 1529-1530 [253 Cal.Rptr. 331] ["According to the property owners and amicus, if the State, at this late date, can assert a public trust easement over patented [shorezone] land, the result would be chaotic, especially as to land which has been developed without previous objection by the State."])

In the present case, of course, the shorezone land in question lies in the northern portion of California; and rights under the treaty are not directly implicated. However, the same principles identified by the United States Supreme Court in *Summa Corp.* apply by analogy; and we observe that the treaty rights in that case were originally established in order to give Mexican landowners rights in their property equivalent to those held by other landowners. We have in this case a similar agglomeration of long-standing administrative acquiescence and extensive private reliance on a prior unappealed trial court decree, which established the normal minimum elevation widely accepted as the lakeward boundary of littoral parcels on Clear Lake at Zero Rumsey.

We hold that, "under all the circumstances" (*State of California* v. *Superior Court* (*Fogerty*), *supra*, 29 Cal.3d at p. 249), the trial court correctly found the elevation of zero on the Rumsey Gauge to be the "low-water mark" of Clear Lake which, under sections 830 and 670, establishes the boundary between state and private ownership.

5. The State's Cross-appeal

Of course, there is a distinction between the recognition of an elevation of Zero Rumsey as the "low-water mark" on Clear Lake which, thus, establishes a horizontal plane, and the delineation of a line on the particular topography of a parcel which is tangent to this plane, thus forming the parcel's lakeward boundary. The trial court properly established Zero Rumsey as the "low-water mark" of the water in the *lake*, which of course seeks its own level. There cannot be more than one "low-water mark"—in the sense of a horizontal plane—within the meaning of section 830.

However, the state has taken a protective cross-appeal because the trial court used a 1967 state survey to set the boundary of appellant's parcel, rather than a previous private survey of 1960.[5]

We recognize that use of the 1967 survey may have had the incidental effect of allowing some of appellant's pre-1967 filling activities to have escaped scrutiny, if the 1967 survey did not accurately reflect the former Zero Rumsey shoreline and if the 1960 survey did. However, even the 1960 survey may not have properly reflected the former natural shoreline, whatever it was. Given the state's history of encouraging dredging and filling of the lakeshore in prior decades, and the "great injustice" which could result if boundaries were to be set, for the purposes of accrued rental liability, based upon uncertain evidence of a hypothetical pristine shoreline in the distant past rather than the lake's more recent and best documented condition, we find the trial court acted properly in choosing the most recent survey—one conducted by the state itself—in setting the boundary of this particular parcel.

## III. DISPOSITION

The judgment is affirmed. Each party shall bear its own costs.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied April 3, 1991.

---

[5] At oral argument, the state appeared to concede this issue was not properly raised below. However, by a letter brief following oral argument, the state pointed out that it had in fact raised this issue in the trial court by a somewhat belated motion, which the trial court denied. Since we reject the state's argument on the merits, we need not decide whether to apply the principles of waiver here to the state's contention. Further, the trial court's ruling quieting title did not purport to sanction previous purprestures on other parcels not in issue here.