# E. RONDELL *v.* CALEB T. FAY *et als.*

EVIDENCE OF INCORPORATION.—Testimony tending to show that a company is a corporation *de facto,* dispenses with strict proof of the corporate character, and precludes the party offering it from afterwards disputing the company's right to act as a corporation.

TESTIMONY AS TO CORPORATE CHARACTER.—If the plaintiff, in his opening, introduces testimony tending to show that a company is a corporation *de facto,* he cannot object to defendant's testimony as to the strict corporate character of the company.

RIGHT TO ACT AS CORPORATION.—An inquiry as to the right of a company to act as a corporation, can only be had at the suit of the State on information by the Attorney-General.

VOID PATENT.—If a patent for land shows upon its face that it is void, it may be attacked, either directly or collaterally, by any party interested in disputing its validity.

PATENT VOID UPON ITS FACE.—If a patent shows that it was issued in the absence of legislation directing a sale of the property described, it is void upon its face.

A PATENT GOOD IN PART AND BAD IN PART.—If the law authorizes the sale of such land only as is under water at ordinary high tide, and belongs to the State by virtue of its sovereignty, and the patent conveys both swamp and overflowed lands, held by the State under the Arkansas Act, and lands owned by the State by virtue of its sovereignty, the patent is good in part and bad in part.

SALT MARSH LANDS.—The term "salt marsh lands" in the legislation of this State, applies to a certain class of swamp and overflowed lands held by the State under the Arkansas Act.

TIDE LANDS. — The descriptive phrase "tide lands" in the legislation of this State, applies to land covered and uncovered by the ordinary tides, which the State owns by virtue of its sovereignty.

PARTY RELYING ON PATENT GOOD IN PART.—If a patent is good in part and bad in part upon its face, and in its description of the land does not separate the good part from the bad, the party relying upon it must show himself within its good call.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The following is the patent offered in evidence by the defendants :

" Whereas, the Legislature of the State of California, on the fourth day of April, A. D. one thousand eight hundred and sixty-four, passed an Act, entitled ' An Act to authorize the sale and conveyance to the North San Francisco Homestead and Railroad Association of certain overflowed lands in the City and County of San Francisco,' which Act authorizes the

location and disposal of a portion of the overflowed and tide lands, belonging to the State by virtue of her sovereignty; and, whereas, it appears by the certificate of Register of the State Land Office, No. 15, bearing date June 7th, A. D. one thousand eight hundred and sixty-four, that he has been duly notified by the State Treasurer that the North San Francisco Homestead and Railroad Association has paid four hundred and forty-six 25-100 dollars to the State of California, in full payment for one hundred and forty-eight and seventy-five one hundredths acres of State salt marsh and tide lands, situated in said San Francisco County, and described as follows, to wit:

" 'Survey No. 15, State Salt Marsh and Tide Lands, San Francisco, Township No. 1, S., 5 W. Range, Mount Diablo Meridian, Sections 31 and 32—fractional parts thereof, more particularly described in field notes of said survey, as follows:

" 'Beginning at the stone monument set for the centre of Devisidero and Chesnut streets, which point is 26.98 chs. north, and 0.33 chs. east of the southeast corner of Section 31. Runs south 77 degs. east 6.00 chs., south 3.00 chs., south $75\frac{3}{4}$ degs. west 6.44 chs., north $68\frac{3}{4}$ degs. west 13.44 chs., north $82\frac{1}{2}$ degs. west 6.98 chs., to line of Government Reserve; run on said line north $7\frac{1}{2}$ degs. west 17.66 chs.; thence south $81\frac{3}{4}$ degs. east 3.88 chs., north 86 degs. east 8.05 chs., south 39 degs. east 9.67 chs., south $59\frac{1}{4}$ degs. east 4.52 chs., north 16 degs. east 6.53 chs., east 0.53 chs., north $41\frac{1}{2}$ degs. west 19.53 chs., north 38 degs. west 4 chs., north $62\frac{1}{4}$ degs. west 7.45 chs., north 79 degs. west 4 chs., to the Government Reserve line; run on said line north $7\frac{1}{2}$ degs. west 5.68 chs.; thence south $72\frac{3}{4}$ degs. east 19.85 chs., south 64 degs. east 9.13 chs., north $81\frac{1}{4}$ degs. east 30.63 chs., south $8\frac{3}{4}$ degs. east 15.63 chs., south 39 degs. west 1.18 chs., south $56\frac{1}{2}$ degs. west 5.55 chs., south $60\frac{1}{4}$ degs. west 10 chs., south 74 degs. west 0.38 chs., south 6.37 chs., south $69\frac{1}{2}$ degs. west 9.87 chs., north $83\frac{1}{4}$ degs. west 10 chs., south $10\frac{1}{4}$ degs. west

2.75 chs., to the place of beginning.   Run by the true meridian ; magnetic variation, 16½ degs. east.'

" Now, therefore, all the requirements of the Act of the State Legislature, in relation to swamp and overflowed lands, having been fully complied with—

" I, Frederick F. Low, Governor of the State of California, by virtue of authority in me vested, have granted, bargained, sold, and conveyed, and by these presents do grant, bargain, sell, and convey, unto the said North San Francisco Homestead and Railroad Association, all the above described lands, with the appurtenances thereto belonging, to have and to hold unto the said association, its heirs and assigns, forever.

" In testimony whereof, I, Frederick F. Low, Governor of the State of California, have caused these letters to be made patent, and the seal of the State of California to be hereunto affixed.

" Given under my hand, at the City of Sacramento, this, the twenty-third day of June, in the year of Our Lord, A. D. one thousand eight hundred and sixty-four.

|  | [Signed :] | " FREDERICK F. LOW, |
| { SEAL } |  | " *Governor of State.* |
|  | Countersigned : |  |
|  | " Attest : | B. B. REDDING, |
|  |  | " *Secretary of State.* |
| { SEAL } | [Signed :] | " J. F. HOUGHTON, |
|  |  | " *Register of State Land Office.* |
|  | " By A. S. BENDER, *Deputy.*" |  |

On the trial, the plaintiff, to make out his case, introduced as a witness McNabb, one of the defendants, who testified as to pulling down of fences on the *locus in quo*, and that he was hired by the North San Francisco Homestead and Railroad Association.   The jury found a verdict for the defendants.

The other facts are stated in the opinion of the Court.

*Cutter & Washington*, for Appellant.

By the terms of the statute entitled "An Act to authorize the formation of corporations to provide the members thereof with homesteads, or lots of land suitable for homesteads," approved May 20th, 1861, (Hittell's Digest, Sec. 1,072,) the forms and limitations are declared under which the inhabitants of this State may incorporate for certain purposes. It declares that not less than seven persons may associate themselves into an incorporated company, for the purposes of a homestead association, but for no longer period than five years. (Hit. Dig., Sec. 1,073.) The certificate of incorporation offered by the defendants, having but five corporators and being for a term of fifty years, is not sufficient under the said law of May 20th, 1861. The certificate is therefore void on its face. The patent attempts to convey lands not authorized by the Act; and that attempt appears on its face. While the Act is wholly silent as to the character of the title by which the State holds the lands intended to be granted, it *describes* lands held by virtue of its sovereignty, land below high water mark, along the front of the lands of the association, to six feet depth of water. The southern boundary is the front of the lands of the association; the northern boundary is the line of six feet depth of water. The State in issuing their patent (which refers to and is on its face predicated on the Act) evidently understood the Act as referring to the lands held by virtue of its sovereignty, for it says: "which Act authorizes the disposal of the overflowed and tide lands belonging to the State, by virtue of its sovereignty;" that is the interpretation of the officers intrusted to make the patent. No lands belong to the State by virtue of its sovereignty, except "the shore of the sea, and of its bays and inlets, in the common law definition of the word 'shore;' that is, the land usually overflowed by the neap or ordinary tides." (*People ex rel. Pierce* v. *Morrill,* 26 Cal. 336.)

Having thus defined the land which the officers understood the Act to authorize them to grant, the patent goes on to say, "that it appears by the certificate of the Register of the State Land Office, No. 15, that he has been duly notified, etc., that

the association has paid four hundred and forty-six dollars and twenty-five cents to the State, in full payment for one hundred and forty-eight and three quarters acres of salt marsh and tide lands, described as follows," etc., and these are granted. Here, then, we have under this Act a patent issued for, in part, marsh lands. If water front (lands below high water) lands held by the State, by virtue of its sovereignty, are alone authorized to be granted, there is no authority to grant "marsh lands." Unless a patent is *issued without authority*, or is *prohibited by statute*, or is void upon its face, its operation cannot be questioned in any collateral suit. This patent is to marsh lands, is issued without authority, and its issuing is prohibited by statute. (*Boggs* v. *Merced M. Co.* 14 Cal. 356 ; *Yount* v. *Howell*, 14 Cal. 469.) "The principle has been frequently admitted that the fraud must appear on the face of the patent to render it void in a Court of law." Here we contend that the grant of marsh land was not authorized —was prohibited—and that the grant of marsh land made under these circumstances is a fraud on the State (if the State owned the lands) on the face of the patent.

*Barstow & Tompkins*, for Respondents.

The question arises here whether the appellant, not pretending to have any title to the land, and only claiming therein a loose sort of possession of two or three years duration, can be allowed to attack a patent issued over the great seal of the State, upon the grounds attempted in this case. In other words, whether as to him, a mere naked trespasser on lands belonging to another, a patent of the State for the same lands is not conclusive.

The Supreme Court of the United States, in the case of *Cooper* v. *Roberts*, 18 How. 182, upon the question of the presumed regularity of official acts, says: "The defendant further objects, that the officers of the State violated the statutes of Michigan in selling these lands after they were known or might have been known to contain minerals. We are of the opinion that the defendant is not in a position to raise the

question on this issue.    The officers of the State of Michigan, embracing the chief magistrate of the State, and who have the charge and superintendence of this property, certify this sale to have been made pursuant to law, and have clothed the purchaser with the most solemn evidence of title.    The defendant does not claim in privity with Michigan, but holds an adverse right, and is a trespasser upon the land to which her title is attached.    Michigan has not complained of the sale, and retains, so far as the case shows, the price paid for it.    Under these circumstances, we must regard the patent as conclusive of the fact of a valid and regular sale on this issue."

This Court, in *Terry* v. *Megerle*, 24 Cal. 624, adopts substantially the views of Mr. Justice Field, in *Doll* v. *Meador*, 16 Cal. 325, holding that there are two grounds upon which a patent may be impeached collaterally in an action of ejectment: First, By showing that the land did not belong to the State, or is not included in the Act authorizing the grant; and Second, By showing that it is excepted by law from the lands authorized to be granted; in other words, as it is usually stated, that the State had no title, or that the law under which the grant was made gave no authority to the officers to make it.

The Court also adopts the rule laid down in that case as to the *status* of the party who is permitted upon those grounds to impeach a patent: "He must first bring himself in some privity with the common source of title." So in *People* v. *Stratton*, 25 Cal. 251: "The party who may be permitted thus to impeach a patent issued by the State, must himself possess a *status* authorizing him to do so.    He must show that he has title to the premises, or such an interest therein, in subordination to the title, wherever it may reside, as will authorize him to call the true title to his aid." *Robinson* v. *Forrest*, 29 Cal. 320.

Upon this line of reasoning we arrive at the same result reached by the cases cited, that mere possession does not give the right to impeach a patent upon the grounds under consideration.    Upon the other ground, that the patent is void

upon its face, the law is settled that it may be attacked at all times and in all places, and by every person against whose possession it is aimed. We do not disagree with appellant's counsel upon the law of their argument upon this point, but we deny the fact. An instrument may be fair upon its face, but void in fact. A deed executed under power of attorney may be formal and legal in all its parts, and yet void for want of authority on the part of the attorney to execute it. But it would not be void *on its face;* it would be valid on its face. The term *void on its face*, so often made use of in the cases, signifies a defect in the form, structure or execution of a patent, which is apparent from an inspection of the instrument. It may be void in fact as to a portion of the land attempted to be conveyed, because not authorized by law, but the defect can only appear by an examination of the law giving the power, and not upon the face of the patent—in which case it could not be said to be void on its face. " The principle has been frequently admitted that the fraud must appear on the face of the patent to render it void in a Court of law, and that when the fraud or other defect arises, *dehors* the grant, the grant is voidable only by suit." (14 Cal. 366; *Winter* v. *Jones*, 10 Ga. 190; *Jennings* v. *Whittaker*, 4 Monro, 50.)

By the Court, Shafter, J. :

Action to recover damages for breaking and entering the plaintiff's close. The defendants denied all the allegations of the complaint, and further defended on the ground that the *locus in quo* was the property of the North San Francisco Homestead and Railroad Association, a corporation formed under the laws of California, and that they, the defendants, performed the acts complained of as the agents and servants of said company. The appeal is by the plaintiff and is taken from the judgment and order denying a new trial.

First—For the purpose of proving the corporate existence of the company, the defendants offered in evidence an instru-

ment purporting to be a certificate of incorporation of the North San Francisco Homestead and Railroad Association, signed and sealed by five persons only. The incorporation purported to be for twenty-five years. The plaintiff objected to the admissibility of the document, on the ground that five persons could not, by law, incorporate for homestead purposes, nor for a longer time than five years. The objection was overruled, and the plaintiff excepted.

There was no error in the ruling available to the plaintiff. The opening testimony of the plaintiff tended to prove that the company was a corporation *de facto*, and that evidence not only dispensed with the necessity of strict proof of the corporate character, but precluded the plaintiff from inquiring into or disputing it. Such inquiry could be had only at the suit of the State or on information by the Attorney-General. (Hittell, Art. 751.)

Second—To prove title in the corporation to the *locus in quo*, the defendants gave in evidence a special Act of the Legislature, entitled "An Act to authorize the sale and conveyance to the North San Francisco Homestead and Railroad Association of certain overflowed lands in the City and County of San Francisco," approved April 4, 1864 (Laws 1864, p. 482,) and then offered in evidence a patent of the State of California, dated June 23, 1864, purporting to be based upon the Act. Objection was taken by the plaintiff, on the ground that the patent "was void on its face and professed to grant lands not authorized by the Act." The patent was received and read to the jury, under the plaintiff's objection, and "subject to all objections as to its effect." At a later stage in the trial the counsel of the plaintiff moved that the patent be stricken from the evidence, on the ground, "First—That it does not commence where the Act of April 4, 1864, authorized it to commence; Second—That it embraced on its face lands not authorized to be granted by the statute; Third—That it not only takes land above the ordinary high water mark, but

46

extends out beyond six feet deep at low water." The motion was denied and the plaintiff excepted.

It is settled by the decisions in this State, that if a patent be void upon its face it may be assailed at any time and in all cases; for it is itself in such case record evidence of the matters which render it a nullity. And it is also settled, if a patent show upon its face that it was issued in the absence of legislation directing a disposition of the property described, that a case will be made out within the principle. Such patent may therefore be collaterally attacked in any action by any party interested to dispute its validity. (*Doll* v. *Meador*, 16 Cal. 297; *Terry* v. *Megerle*, 24 Cal. 624; *People* v. *Stratton*, 25 Cal. 251.) The learned counsel for the respondents dispute neither the correctness nor the conclusiveness of these judgments. The only point made by them in answer to the objection is, that the sale was not in any degree *ultra vires* on the face of the patent. We consider however that the second ground assigned by the plaintiff in support of his general objection to the admissibility of the patent in question to have been well taken as to the marsh lands included therein.

The only legislative warrant for the sale of State lands to the defendant is found in the special Act of 1864, upon which the patent purports to be based. The lands to be sold and conveyed to the company are described in the title of the Act as "certain overflowed lands in the City and County of San Francisco." This description is vague and imperfect, but it is rendered sufficiently precise by a further description contained in the body of the Act. The lands are there described as lands "belonging to the State in front of lands of said association in the northerly portion of the City and County of San Francisco, west of Buchanan street." So far the description throws no light upon the quality of the land to be sold and conveyed, nor upon the nature or origin of the State's title to it. But the description proceeds: "Commencing at the northerly boundary of the lands of said association at high water mark on said Buchanan street, and extending to a distance north where the water is not exceed-

ing six feet deep at low water along the entire front of the
land of said association upon said northerly boundary thereof;
and extending westerly to said reservation ; provided, that in
no case shall it extend to a depth of water exceeding six feet
at the lowest stage of the tide, nor interfere with the water
front of the adjoining property." It is claimed by the counsel
of the plaintiff that this description is applicable, and applica-
ble only to lands owned by the State by reason of its sover-
eignty; that is to say, lands below ordinary high water.
(*People* v. *Morrill*, 26 Cal. 336.) And such we consider to be
the clear result of the description on its face. The point of
beginning is at " *high water mark* in the northerly boundary
of lands belonging to the association." High water mark, in
the absence of all statements to the contrary, must be intended
to mean " ordinary high water mark ;" the point at which
the sovereign ownership of the State begins. The line extends
thence to the north—not landward, but seaward—to a point
" where the water is not exceeding six feet deep at *low water*."
From that point the line turns west and runs under the water
at the depth of six feet at the lowest stage of the tide along
the entire " front " of the lands, in the northerly boundary of
which, one point, at least, is touched by ordinary high water.
And we consider that it must be understood, from the descrip-
tion, that that boundary coincides with the line of ordinary
high water throughout its entire length. The term " front "
applied to that line, indicates such general coincidence ; and
so does the fact already named, that one point in the line is
expressly put at high water; but the provision that the line
drawn to the west under water, not exceeding six feet in
depth, shall not " interfere with the water front of the adjoin-
ing property " demonstrates it. The adjoining property here
alluded to must be the " land of the association " previously
named, and along or over against whose entire " front " the
water boundary of the patented lands is drawn. It must be
understood that the front first alluded to is identical with the
front last alluded to and distinguished as " water " front—
that is, the line, *prima facie*, of ordinary high water. The

result is, that the land embraced in the offer to sell, is, according to the statute description of it, all under water at ordinary high tide, and belonged to the State by reason of its sovereignty.

Now as to the patent; there are two descriptions given in it of the lands which it purports to convey. The first is by naming them " State salt marsh and tide lands;" the second is by courses and distances—the last giving no clue to the character of the land.

" Salt marsh " was first used to designate a class of lands belonging to the State in an Act passed May 13, 1861 (Acts 1861, p. 361, Sec. 27,) and we understand the term as applying to a certain class of " swamp and overflowed lands " held by the State under the " Arkansas Act " of September 28, 1850 (26 Cal. 352.) The descriptive phrase " tide lands " also occurs for the first time in the legislation of this State, in the Act of May 13, 1861; and it is applied to lands covered and uncovered by the ordinary tides (*People* v. *Davidson*, 30 Cal. 379.) As there is no third class of lands belonging to the State in which the characteristics of marsh and tide lands are blended, we interpret the patent as calling for marsh lands in part and for tide lands as to the residue. The latter is the efficient call of the patent, the former being null and void for the reasons already stated. The patent being good in part and bad in part, and there being no intendment that the *locus in quo* was on that part of the general area described by courses and distances which is made up of tide lands, the burden was upon the defendants of proving that such was the fact—that is to say, the burden was upon them of showing themselves within the only efficient call of the instrument under which they justified. Evidence was introduced by the defendants tending to prove that the fences torn down by them were on land below the line of ordinary high water, while the testimony of the plaintiff tended to prove that they were above that level, and were either marsh or upland; one of which only was within the terms of the patent, and neither of which was within the offer to sell. On this state of the

evidence the Court told the jury, amongst other things, that "if they found on the evidence that the land on which the alleged trespass took place, where the fences stood, was above ordinary high water mark, but subject to periodical overflow of spring tide seas, they could not consider the injury to the plaintiff as against their holding under the patent." This instruction was, in our judgment, erroneous. The jury were told, in effect, that the defendants would be entitled to recover, if the *locus in quo* was not in fact within the only operative call of the patent under which they justified.

The case at bar is not like that of *Carder* v. *Baxter*, 28 Cal. 99, cited for the respondents. The patent in that case was for swamp and overflowed lands, and it was held that the defendant being a stranger to the paramount source of title, could not dispute that the lands were in fact what they were represented to be in the patent. According to the patent in the case at bar, the *locus in quo* was either marsh lands or tide lands, but the patent did not determine which. The defendant undertook to show which it was by evidence introduced for that purpose, and the plaintiff co-operated in clearing up the question by evidence on his part.

Judgment reversed and new trial granted.