[No. A061428. First Dist., Div. Five. May 2, 1994.]

LITTORAL DEVELOPMENT CO. et al., Plaintiffs and Appellants, v. SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION, Defendant and Respondent.

**COUNSEL**

Bowers, Thomas & Associates, Terry J. Thomas and Sherry B. Bowers for Plaintiffs and Appellants.

Ronald A. Zumbrun and Robin L. Rivett as Amici Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, and Linus Masouredis, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

PETERSON, P. J.—In order to protect San Francisco Bay from further environmental degradation through filling and development, the Legislature created the San Francisco Bay Conservation and Development Commission (BCDC), and gave BCDC jurisdiction over all areas of the bay subject to "tidal action"—which for purposes relevant here the Legislature defined in Government Code[1] section 66610. This statute specifically defined San Francisco Bay, for purposes of BCDC jurisdiction and as here pertinent, as including all sloughs; "marshlands" extending from a seaward line of "mean high tide" of the bay to a landward line five feet above mean sea level; "tidelands" lying between mean high tide and mean low tide; and "sub-merged lands" lying below mean low tide.

Section 66610 also conferred jurisdiction to BCDC over a "shoreline band." That band is measured 100 feet landward of and parallel with the shoreline of San Francisco Bay. BCDC contends that the "shoreline" of San Francisco Bay, comprising the seaward boundary of the 100-foot "shoreline band" under its jurisdiction, is coterminous with the level of the *highest* tide recorded since 1965, when BCDC was formed. In this case, it has sought to regulate the use of appellant's land accordingly.

We reject BCDC's contention and hold that the "shoreline" of San Francisco Bay, comprising the seaward boundary of the 100-foot shoreline

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Government Code.

band under BCDC's jurisdiction, is the line of mean high tide of the bay, which *only in marshlands* is extended landward to a line 5 feet above the line of mean sea level.

We thus reverse part of the trial court's decision, which validated BCDC's assertion of its jurisdiction over upland portions of a previously developed and filled parcel, littoral to the bay, which was not shown to lie within the 100-foot shoreline band of BCDC's jurisdiction. We affirm the portion of the trial court's decision which validated BCDC jurisdiction over a small salt marsh on the bayward one-third of the parcel, which was within BCDC's statutory jurisdiction over marshlands.

## I. FACTS AND PROCEDURAL HISTORY

The bayshore parcel in question here has a long and interesting history. For present purposes, we summarize the relevant facts as follows.

The parcel in issue lies in Sausalito, in a low-lying area next to the Richardson Bay portion of San Francisco Bay. Around 1936, while the Golden Gate Bridge was being constructed, some of the spoils excavated in the construction of the bridge were used to fill the landward one-third of the parcel. Over the succeeding decades, successive fillings extended this area bayward. The land continually subsides due to the settling of the underlying bay mud and sediments. As a result, the actual elevation of the land has varied; its height at any particular past time is somewhat difficult to determine.

In the early 1960's, the previous owner of the parcel filled it out to the bayward limits of the parcel. The height of the parcel after this filling is a matter in dispute; the prior owner believed he had filled it himself to a height of about seven feet, but professional surveys done after the filling mostly show heights in the range of four to five feet.

In 1965, BCDC was given jurisdiction over the bay by a legislative grant, the terms of which we will explore in the succeeding section of this opinion. One relevant fact for purposes of this case is that BCDC has regulatory power over any parcel which was within the limits of its jurisdiction in 1965, or which became so thereafter; filling subsequent to 1965 would not divest BCDC of this jurisdiction.

In 1976, appellants Littoral Development Co. and Diversified Realty Services, the new owners of the parcel, filled and fenced the landward two-thirds of the parcel for use as a parking lot. Appellants subsequently

applied for, but did not receive, a BCDC permit for this filling. The parties devote much time and energy to assailing each other's supposed lack of good faith regarding the permit process for this filling and other related matters, but for present purposes their recriminations regarding the 1976 filling and their subsequent disputes are not directly relevant. The filled and fenced portion of the parcel is mostly below 5.5 feet in elevation, measured from mean sea level, but it was not shown to lie below the level of mean high tide, either in its present condition or prior to the 1976 filling. This landward two-thirds of the parcel has historically been inundated by water only in exceptional or record high tides, or during major storms which might occur about once or twice every decade. The upland portion of the parcel is not marshland, and has been used for parking or storage of vehicles and other related uses since at least 1977.

The bayward, unfenced portion of the parcel, however, now constitutes a small parcel of low-lying salt marsh, covered with vegetation of a type which is characteristic of salt marshes around the bay.

Since at least 1976, the question of BCDC's jurisdiction over the parcel has been in dispute. In brief, BCDC contends here that almost all of the parcel is within the shoreline of the bay, or within the shoreline band as BCDC would define it, since it has been inundated in the past by record high tides. Appellants contend no portion of the parcel lying more than 100 feet landward of the line of mean high tide has been subject to BCDC jurisdiction for the period from 1965 to the present.

Appellants desired to construct a hotel on the property. In order to do so, they had to obtain permits both from Marin County, for any portion of the property not within BCDC jurisdiction, as well as from BCDC for the area within its bay and shore zone jurisdictions. Since the dividing line between these respective jurisdictional limits was not known, the county asked BCDC to determine the limits of its jurisdiction over the parcel.

BCDC thereafter followed the recommendation of its staff, and ruled that almost all of the parcel (excepting only one small portion of a corner on the landward side) was within the shoreline of the bay. The BCDC decision reasoned that the parcel lay almost entirely within the bay because its elevation was beneath the level of the highest recorded high tide since 1965, which was about 5.5 feet above sea level.

Appellants brought this action, seeking a writ of mandate from the superior court overturning the BCDC decision. The superior court denied the petition. Appellants ultimately filed a timely appeal from a resulting judgment.

Later, BCDC also issued a cease-and-desist order which would require appellants to remove the fill placed on the landward two-thirds of the property in 1976 without a BCDC permit. Appellants brought a separate action in the superior court contesting the cease-and-desist order, which is the subject of a separate appeal (*Littoral Development Co.* v. *San Francisco Bay Conservation etc. Com.* (A064842)) pending in this court.

## II. DISCUSSION

We conclude we must affirm in part, reverse in part, and remand. BCDC and the superior court correctly ruled that the bayward one-third of the parcel was a low-lying salt marsh within BCDC jurisdiction. As we explain, however, the landward two-thirds of the parcel is not part of any marsh, and was filled and developed and used continually since before 1965 when BCDC came into existence, and is not subject to the jurisdiction of BCDC.

### A. *The Landward Two-thirds of the Parcel*

The landward two-thirds of the parcel was not shown to lie less than 100 feet beyond the level of mean high tide at any time from 1965 to the present. ▉▉▉ We will invalidate BCDC's attempt to assert jurisdiction based upon record high tides which in the past have occasionally inundated the parcel. For jurisdictional purposes, the shoreline of the bay commences at the line of mean high tide, except in marshlands. BCDC cannot expand its jurisdiction landward by administratively redefining the shoreline of the bay as the line of maximum inundation of bayshore property by occasional and exceptional high tides occurring since 1965.

We begin with the statute. In 1965, the Legislature enacted the McAteer-Petris Act (§ 66600 et seq.), which sets the limits of BCDC's jurisdiction over the bay. (See *Acme Fill Corp.* v. *San Francisco Bay Conservation etc. Com.* (1986) 187 Cal.App.3d 1056, 1068 [232 Cal.Rptr. 348]; *Mein* v. *San Francisco Bay Conservation etc. Com.* (1990) 218 Cal.App.3d 727, 732 [267 Cal.Rptr. 252].) As originally enacted, section 66610 defined BCDC's jurisdictional limits over the bay in relevant part as follows: "For the purposes of this title, the San Francisco Bay includes the shoals outside the Golden Gate and the water areas from the south end of the bay to the Golden Gate and to the Sacramento River line . . . and, specifically, the marshlands (land lying between mean high tide and five feet above mean sea level); *tidelands (land lying between mean high tide and mean low tide)*; and submerged lands (land lying below mean low tide), *but excluding* from the marshlands, tidelands and submerged lands *those lands which are not subject to tidal action.*" (Stats. 1965, ch. 1162, § 1, pp. 2941-2942, italics added.)

Certain features of this language bear reemphasis as they have been carried over into the present version of the statute. BCDC is given jurisdiction over the bay proper, that is, the waters of the bay; over marshland lying lower than five feet above mean sea level; over the area between mean high tide and mean low tide; and over submerged lands lying lower than mean low tide. However, all these areas must be subject to "tidal action"; that is, if a low-lying area otherwise within one of the enumerated categories is not open to the bay and, therefore, does not experience tidal flows, then it is not within BCDC's jurisdiction.

As section 66610 was amended in 1969 (Stats. 1969, ch. 713, § 5, p. 1399), the present statutory language has been reorganized as follows, in relevant part, without changing its meaning for present purposes: "For the purposes of this title, the area of jurisdiction of [BCDC] includes: [¶] (a) San Francisco Bay, being *all areas that are subject to tidal action* from the south end of the bay to the Golden Gate . . . and to the Sacramento River line . . . , including all sloughs, *and specifically*, the marshlands lying between mean high tide and five feet above mean sea level; *tidelands (land lying between mean high tide and mean low tide)*; and submerged lands (land lying below mean low tide). [¶] (b) A shoreline band consisting of all territory located between the shoreline of San Francisco Bay as defined in subdivision (a) of this section and a line 100 feet landward of and parallel with that line . . . ." (Italics added.)

As it is now written, the present statute also uses the line of "mean high tide" to define the shoreline of the bay, except in marsh areas, where a line based upon elevation is used. In this action, it is uncontested that BCDC has a shore zone jurisdiction of 100 feet landward of the shoreline of the bay, as specified in section 66610. The dispute here concerns the drawing of the jurisdictional line representing that shoreline[2] under subdivision (a) of section 66610, from which the 100-foot shoreline band is determined.

BCDC by administrative action, and in the decision under review here, has adopted the position that its jurisdiction over tidal land which is not marshland reaches to the highest high tide which is ever experienced in the bay after 1965, not merely to the line of "mean high tide" as specified in section 66610. To this end, BCDC relied upon a methodology which determined the "Line of Highest Tidal Action" (LHTA) on the parcel, which BCDC then used as its jurisdictional boundary.

BCDC relies here upon a record high tide or LHTA which occurred in 1973 of 5.5 feet above sea level, and contends it has jurisdiction over all that

---

[2] Hereafter, we will use the term shoreline as it is defined in section 66610, to signify the line of mean high tide, except in marshlands.

portion of the parcel in question here which lies below this highest tide level since 1965; and implicitly that the seaward boundary of the 100-foot shoreline band subject to its jurisdiction is coterminous with the point of this highest tide level, rather than the line of mean high tide. Appellants, and the amicus curiae Pacific Legal Foundation, contend that BCDC has thereby arrogated to itself jurisdiction over infrequently flooded dry upland, which is not part of the bay and which the Legislature never intended to place under BCDC jurisdiction.

 On this issue of statutory interpretation, we exercise de novo review; we are not bound by the agency's own interpretation of its jurisdiction as specified by legislation, since "the courts are the ultimate arbiters of the construction of a statute." (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2].) "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]; see also *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388-1389 [241 Cal.Rptr. 67, 743 P.2d 1323] (*Dyna-Med*).) We conclude that appellants and the amicus curiae are correct as to the meaning of the statute.

 The relevant principles of statutory construction all support this result. First, from a reading of the statute, its plain meaning clearly appears to be that (except as to marshlands, where a specified line of elevation is used) the shoreline of the bay shall be set with reference to the specified level of "mean high tide"; the statute nowhere uses the term "highest tide" or any equivalent term which would support BCDC's argument. The wording of the statute according to its "plain meaning" thus leaves little room for BCDC's inapposite construction. (See *California Assn. of Psychology Providers* v. *Rank, supra,* 51 Cal.3d at pp. 12-14.)

BCDC contends the term "subject to tidal action" might be taken to apply to areas up to the level of the highest tide ever recorded. This argument is at variance with the plain meaning of the statute, when considered as a whole. It would attach an unusual new meaning to the term "subject to tidal action" which in its traditional and plain meaning merely is an alternative legal description of tidelands, the area lying between mean low tide and mean high tide and subject to the usual reflux of the tides. (See *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 518-519, fn. 1 & 534 [162 Cal.Rptr. 327, 606 P.2d 362].) The term "tidal *action*" (italics added) also connotes a regularity of tidal ebb and flow, not a one-time event such as the highest recorded high tide.

Further, the "tidal action" component in the statutory definition is properly used to *exclude* those areas which are otherwise within the definition by measurement of elevation, yet are not part of the bay. For instance, if an enclosed reservoir were dug in the center of a city on the bay landward of the 100-foot shoreline band, in order to store drinking water, BCDC would not acquire jurisdiction over the reservoir even if its bed were below the line of mean high tide, since the reservoir would not be subject to the "tidal action" of the bay. The interpretation offered by BCDC attempts to bootstrap the words "tidal action," for lack of which property outside the shoreline band was intended to be excluded from BCDC jurisdiction, into a positive *grant* of such jurisdiction, conflicting with the line of "mean high tide" specified elsewhere in the statute.

BCDC has promulgated a regulation, printed in California Code of Regulations, title 14, section 10123 (regulation 10123), which purportedly defines the statutory term "subject to tidal action" as used in section 66610: " 'Subject to tidal action' means touched by tidal waters at any time on or after September 17, 1965 . . . ." BCDC mistakenly relies upon this regulation it promulgated as giving it jurisdiction over all areas above mean high tide, up to the level of the highest recorded high tide and for 100 feet landward of that level. However, the line of mean high tide itself is always, by definition, a line "subject to tidal action"; BCDC's interpretation would render surplusage the Legislature's specification of the term "mean high tide" and would substitute the unwritten term "highest recorded high tide." We must reject this approach: The Legislature obviously meant what it said when it used the term "mean high tide"; we should not adopt an interpretation which renders this term mere surplusage. (See *Dyna-Med, supra,* 43 Cal.3d at p. 1397; accord, *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 51 [276 Cal.Rptr. 114, 801 P.2d 357].) In short, we read the statute literally as well as littorally.

This statutory reading is also the only one consistent with application of the maxim of jurisprudence, " '*Expressio unius est exclusio alterius . . . .*' " (See *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 410 [267 Cal.Rptr. 589, 787 P.2d 996]; *Miller* v. *Superior Court* (1990) 221 Cal.App.3d 1200, 1210 [270 Cal.Rptr. 766].) The Legislature has specified that the line of mean high tide shall be used to determine the shoreline of the bay, *except* upon marshland where a rule based upon elevation (five feet above mean sea level) is applied. If the Legislature had wished to expand this exception to cover the entire bay shoreline, not simply marshland, it presumably would have done so. Moreover, specification of the 5-foot level for marshland obviously undercuts BCDC's argument for a level of 5.5 feet

determined by elevation in all areas. The BCDC interpretation would either render the exception for marshlands entirely surplusage, or would result in the absurd result that marshlands were protected only up to the level of 5 feet, even though other areas were protected up to the level of 5.5 feet. Such clearly was not the legislative intent; the exception for marshlands was obviously intended to provide more, not less protection for the vital salt marshes of the bay, which generally lie above the level of mean high tide. We should not adopt an interpretation which either renders parts of the statute surplusage, or leads to such an absurd result. (See *Dyna-Med, supra,* 43 Cal.3d at pp. 1392, 1397.)

This interpretation is also the only one consistent with the statutory construction principles of *ejusdem generis* and *noscitur a sociis.* (See *Dyna-Med, supra,* 43 Cal.3d at p. 1391 & fns. 12 & 14.) The term "subject to tidal action" has been itself defined by the Legislature in the statute, as applying to tidal areas below mean high tide and marshes below five feet in elevation. The Legislature would not have so defined these areas in the statute if it had wished instead to accord a much more all-encompassing meaning to the phrase "subject to tidal action." (See *ibid.*) Reading the statutory terms as a whole and in proper context, we cannot reach any other conclusion.

Moreover, an examination of the case law concerning California tidelands shows that, if the Legislature had wished to enact BCDC's position, it would not have specified the common law boundary of the tidelands, which is mean high tide, but could instead have specified the civil law boundary, which reaches to the point of the highest water. ▮ As Mr. Chief Justice Hughes put it in *Borax, Ltd.* v. *Los Angeles* (1935) 296 U.S. 10, 22-23 [80 L.Ed. 9, 18, 56 S.Ct. 23], while contrasting the common law measure of the tidelands derived from England, and the civil law measure derived from the Byzantine recodification of Roman law under the Emperor Justinian: "The tideland extends to the high water mark. [Citations.] This does not mean, as petitioners contend, a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides. By the civil law, the shore extends as far as the highest waves reach in winter. Inst. lib. 2, tit. 1, § 3; Dig. lib. 50, tit. 16, § 112. But by the common law, the shore 'is confined to the flux and reflux of the sea at ordinary tides.' [Citation.] It is the land 'between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails.' [Citation.]"

Thus, California law has always and consistently adopted the common law measure of the tidelands, the area subject to tidal action, as delineating the

area below mean high tide, not the area covered by exceptional floods or record high tides. In *County of Lake* v. *Smith* (1991) 228 Cal.App.3d 214, 225 [278 Cal.Rptr. 809], Division Two of this district traced this principle of California law back "at least" as far as the case of *Rondell* v. *Fay* (1867) 32 Cal. 354, 363, which reached this very result with reference to the state's ownership of the shore of San Francisco Bay. Five years after *Rondell*, the Legislature codified this common law presumption in Civil Code section 830 ["Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high-water mark . . . ."], and in Code of Civil Procedure section 2077, subdivision Five ["When tide water is the boundary, the rights of the grantor to ordinary high-water mark are included in the conveyance."].

 Whenever the tidal waters of California have been in issue, the Legislature and the courts have always determined that the boundaries of any parcel, the boundaries of the state's sovereign ownership, or the boundaries of the state's trust powers over the shore zone, are all decided with reference to ordinary high tide or mean high tide; no California case or statute has ever used the civil law measure of highest high water urged by BCDC. (See, e.g., *United States* v. *Pacheco* (1864) 69 U.S. (2 Wall.) 587, 590 [17 L.Ed. 865], 866] [A parcel bounded by San Francisco Bay was limited by the line of ordinary high tide: "When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails." (Citing 3 Kent, 427.)]; *Rondell* v. *Fay, supra,* 32 Cal. at p. 363; *Knight* v. *U. S. Land Association* (1891) 142 U.S. 161, 186 [35 L.Ed. 974, 983, 12 S.Ct. 258] [The tidelands of the bay do not extend into the City and County of San Francisco to the line of highest water: " 'The lands which passed to the State upon her admission to the Union were not those which were affected occasionally by the tide, but only those over which tide water flowed so continuously as to prevent their use and occupation.' "]; *Borax, Ltd.* v. *Los Angeles, supra,* 296 U.S. at pp. 22-23 [80 L.Ed. at pp. 17-18]; *People* v. *Wm. Kent Estate Co.* (1966) 242 Cal.App.2d 156, 159 [51 Cal.Rptr. 215] [A boundary must be determined by the line of mean high tide, not the highest wave or line of water.]; *Aptos Seascape Corp.* v. *County of Santa Cruz* (1982) 138 Cal.App.3d 484, 505-506 [188 Cal.Rptr. 191] [There is no public trust right or servitude over land above the level of mean high tide to "the highest high water line" on a tidal parcel, since California now generally follows the common law, not a postulated civil law standard derived from Spanish and Mexican law.].)

 It is also significant that in passing the McAteer-Petris Act to safeguard the bay, and in specifying the common law boundary based upon

mean high tide, the Legislature was acting as the "trustee of the tidelands" in California. (*City of Berkeley* v. *Superior Court, supra*, 26 Cal.3d at pp. 531-532.) In California, the tidelands and resulting area of state trust rights extend, by definition, only to the level of mean high tide. (See *id.* at p. 518, fn. 1.) The state is not the trustee of the uplands, and has never purported to grant to BCDC jurisdiction over upland parcels which might occasionally be covered by a tidal wave or other rare event.

 Our review of the case law indicates that, whatever the historic civil law rule may have been, since statehood, whenever the California Legislature or our courts have dealt with boundaries and titles to shoreline property subject to the ebb and flow of tides (and concomitant issues based thereon), the law has defined those seaward boundaries as measured by the line of mean high tide, *not* as measured by the line of tidal water at the flood or other extraordinary occasional high, or historical highest, tidal level. There is absolutely no indication in the language of the statute or the legislative history of section 66610 that the Legislature intended to enact, sub silentio, a jurisdictional measure based instead upon Roman law principles suited to the relatively tideless enclosed sea of the Mediterranean, rather than the common law measure derived from areas littoral to oceanic waters, as the boundary and baseline demarcating the point from which BCDC's jurisdiction over a 100-foot shoreline band commences. To the contrary, the Legislature specifically enacted the common law measure based upon mean high tide.

BCDC's arguments to the contrary are unpersuasive, and its authorities cited in favor of those arguments fail to support them. BCDC urges primarily that its position is supported by reading out of context certain dicta contained in two decisions by Division Four of this district, *Blumenfeld* v. *San Francisco Bay Conservation etc. Com.* (1974) 43 Cal.App.3d 50 [117 Cal.Rptr. 327] (*Blumenfeld*), and *People* ex rel. *San Francisco Bay etc. Com.* v. *Gianulias* (1986) 188 Cal.App.3d 520 [233 Cal.Rptr. 621] (*Gianulias*). However, neither of those decisions dealt with the issue presented in this case, i.e., whether BCDC's jurisdiction follows the line of mean high tide, as the Legislature said, or the line of highest tide, as BCDC says.

*Blumenfeld* decided that certain low-lying land connected to the bay only by a culvert, which culvert lacked a tidal gate and allowed tides to ebb and flow across the subject property, was "subject to tidal action" by artificial means and, therefore, within BCDC jurisdiction. (43 Cal.App.3d at pp. 56-57.) *Blumenfeld* is, of course, entirely consistent with our conclusion that the phrase "subject to tidal action" in section 66610 was intended to exclude

from BCDC jurisdiction those low-lying areas which are not connected with the bay—not to expand BCDC's jurisdiction beyond the line of mean high tide. Otherwise, the case is not on point as it did not deal with the question before us; indeed, the landowner in *Blumenfeld* conceded the property was subject to tidal action, but contended there should be an implied exception for property connected to the bay through artificial means. (43 Cal.App.3d at p. 54.) That is not the issue here.

*Gianulias* also did not deal with the question before us. It only held that low-lying land which had previously been separated from the bay by a levee, had later once again become "subject to tidal action" and, therefore, within BCDC jurisdiction, after the levee failed and the land in question was "inundated"—which the court noted is "a situation that continues to exist today." (*Gianulias, supra,* 188 Cal.App.3d at p. 523.) Such is obviously also not the case here; the land here never was permanently "inundated" by the sudden failure of a levee. It is interesting to note that in *Gianulias* appellants and BCDC had *stipulated* to a jurisdictional line which established the shore of the bay as including "any portion [of the parcel] lying waterward of the line of mean high tide." Thus, the record of the *Gianulias* case, of which we take judicial notice (Evid. Code, § 452, subd. (d)), certainly does not support BCDC's argument here.

It is true that *Gianulias, supra,* 188 Cal.App.3d at page 526, footnote 4, and *Blumenfeld, supra,* 43 Cal.App.3d at page 57 did cite and approve BCDC's regulation 10123, which provided: " 'Subject to tidal waters' means: touched by tidal waters at any stage of the tide at any time on or subsequent to September 17, 1965 . . . ." We also see nothing wrong with the actual meaning of this regulation. As interpreted in *Blumenfeld* and *Gianulias,* it provides that when, after BCDC's creation in 1965, certain low-lying land which was separated from the bay, but which would be below the line of "mean high tide" as specified in section 66610 (or marshland beneath five feet in elevation), later becomes part of the bay, through artificial connection via a culvert or inundation as by destruction of a levee, the land may come within BCDC's jurisdiction. This is entirely consistent with our interpretation of the phrase "subject to tidal action" as excluding from BCDC's jurisdiction those areas (such as a reservoir in the middle of San Francisco) which are low lying but not tidal. If the regulation were taken to have the meaning BCDC suggests, that BCDC jurisdiction does not generally follow mean high tide and instead follows highest high water, we would reject the regulation as in conflict with the clear wording of section 66610. (See *Dyna-Med, supra,* 43 Cal.3d at pp. 1392, 1397.)

Certainly, neither *Blumenfeld* nor *Gianulias* nor any other reported decision has ever approved of BCDC's attempt to establish its jurisdiction over

lands which are above the level of mean high tide, by BCDC's reliance upon infrequent flooding during storm or flood tides, or record high tides exceeding the level of mean high tide. From the case law, it appears that this is the first time BCDC has attempted to assert jurisdiction over land by relying upon this unusual theory.[3] The statutory language and all existing California authority is clearly to the contrary—BCDC's jurisdiction over land which is not marshland is limited by section 66610 to measurement landward for 100 feet from the level of mean high tide. The Legislature having failed to enact BCDC's view of its jurisdiction by amending section 66610, we must deal with the statute as it currently exists.[4]

Our conclusion, therefore, is that the line of mean high tide, not highest high tide, is the statutory seaward boundary of BCDC's 100-foot shoreline band jurisdiction, except in marshlands. Thus, we reject BCDC's argument that the upland two-thirds of appellants' parcel was within the bay. It was simply never shown to lie beneath the level of mean high tide. Lacking evidence that such portion of the parcel lay beneath mean high tide or was within the 100-foot shoreline band measured landward therefrom, BCDC simply relied upon its theory that the inundation of the parcel during rare floods or extraordinary high tides, coupled with the application of its regulation 10123, moved its jurisdiction further landward. We reverse this portion of the trial court's judgment approving the BCDC determination, as it is inconsistent with section 66610.

### B. *The Bayward One-third of the Parcel*

■ However, a different result obtains as to the bayward one-third of the parcel. As BCDC explicitly found, this unfenced portion of the parcel is a

---

[3]At oral argument, counsel for BCDC was asked whether BCDC jurisdiction would be established over portions of downtown San Francisco if an unusually high tide, on one occasion, covered a substantial portion of Market Street. BCDC's position, relying on regulation 10123, would be that such a unique tidal event would indeed establish its jurisdiction over the portion of downtown San Francisco thus flooded as part of the bay. We find no legislative intent to grant oversight and development protection to BCDC of such areas in such situations.

[4]We also reject BCDC's suggestion that the Legislature's reenactment of the statutes in issue here, after BCDC promulgated regulation 10123 which was later discussed in *Blumenfeld* and *Gianulias*, indicated a legislative endorsement of the "highest high tide" theory here propounded. Regulation 10123, properly construed, does not embody such a theory; neither *Blumenfeld* nor *Gianulias* dealt with or endorsed such a theory when discussing regulation 10123. Further, in the *Gianulias* case, BCDC stipulated in pertinent part to the use of the line of mean high tide, not highest high tide, as the jurisdictional boundary. This prior stipulation by BCDC in *Gianulias* appears to be inconsistent with BCDC's present interpretation of regulation 10123 and, in any event, demostrates that this issue certainly was not before the court in *Gianulias*.

salt marsh, and came within the statutory definition of "marshland" lying lower than five feet above mean sea level. There is uncontradicted evidence that this portion of the parcel is covered by distinctive species of plants which are characteristic of salt marshes; and the land, even when it is not underwater, is covered with salt deposits, indicating regular tidal inundation. It also appears from the surveys done in the middle and late 1960's and thereafter that this portion of the parcel, up to the fence separating it from the upland portion filled in 1976, has always been below five feet in elevation. Section 66610, thus, provides that the bayward portion of the parcel is within BCDC jurisdiction. We affirm this portion of the ruling below.

## C. *Other Issues Mooted*

Our resolution of the case moots many of the remaining issues, and we need not address them. In particular, we need not address the argument of appellants and the amicus curiae that BCDC jurisdiction determined by the level of the highest high tide would constitute an unconstitutional taking. Among other things, the taking issue is also not ripe for review; there is no final decision taking any land. (See *Sierra Club* v. *California Coastal Com.* (1993) 12 Cal.App.4th 602, 617-619 [15 Cal.Rptr.2d 779], review den.; see also *Moerman* v. *State of California* (1993) 17 Cal.App.4th 452, 459 [21 Cal.Rptr.2d 329], review den.) The issue presently before us is simply one of determining where BCDC's jurisdiction over private property lies, and our reversal of the judgment as to the upland portion of the parcel considerably blunts the taking argument—as well as appellants' contentions that BCDC's decision is arbitrary because their littoral neighbors were treated more leniently, since the neighbors' land was not subjected to BCDC jurisdiction up to the line of the highest tide. (Cf. *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. __, __ [120 L.Ed.2d 798, 112 S.Ct. 2886].) Finally, we perceive no abuse of discretion by the trial court in striking from evidence certain voluminous and irrelevant documents which were not part of the administrative record before BCDC; in any event, we do not believe their admission into evidence as part of the administrative record would have led to a different result. (Cf. *Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748, 756, fn. 3 [272 Cal.Rptr. 83].)[5]

---

[5]BCDC theorizes that a rise in sea level of several inches, due to possible global warming, somehow supports its assertion of jurisdiction up to the level of the highest high water. It is impossible to understand how this case has anything to do with global warming. If the sea level does rise, so will the level of mean high tide. BCDC's jurisdictional limit might in the future move marginally landward. However, this is no justification for using a measure not found in the statute as a means of presently asserting jurisdiction over the parcel in issue here.

## III. DISPOSITION

The portion of the judgment which establishes the shoreline of San Francisco Bay for purposes of BCDC jurisdiction at the LHTA rather than the line of mean high tide, thereby including upland fenced portions of appellants' parcel more than 100 feet from the mean high tide line, is reversed. The portion of the judgment which establishes BCDC shoreline jurisdiction as including the marshland portion of appellants' land lying below five feet above mean sea level, and generally comprising the bayward unfenced portion of the parcel, is affirmed. The matter is remanded to the trial court for the granting of a writ of mandate consistent with, and for further proceedings in accordance with, the views expressed in this opinion. All parties shall bear their own costs on appeal.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied May 26, 1994, and respondent's petition for review by the Supreme Court was denied July 28, 1994.